[No. B053325. Second Dist., Div. Four. Apr. 29, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY TAYLOR, Defendant and Appellant.

**[Opinion certified for partial publication.†]**

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

## COUNSEL

Thomas W. Condit, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, William T. Harter and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**EPSTEIN, J.**—In the published portion of this opinion, we discuss the responsibility of a trial court in conducting jury voir dire pursuant to Code of Civil Procedure section 223, added by Proposition 115, and find no basis for reversal in this case. In the unpublished portion of this opinion, we conclude that the prosecution was entitled to present tape-recorded prior inconsistent statements of witnesses, even though, at trial, the witnesses denied only the truth of the statements and did not deny having made them; and that the trial judge properly responded to a jury question asked during the deliberation period. We affirm the judgment.

### PROCEDURAL SUMMARY

Anthony Taylor was convicted of second degree murder, pursuant to Penal Code section 189,[1] with personal use of a firearm. (§ 12022.5.) He had been charged by information with first degree premeditated murder. (§ 187, subd. (a).) In bifurcated proceedings, three prior felony convictions alleged for purposes of enhancement under section 667.5, subdivision (b) were found to be true.

Defendant offered no case-in-chief. The case went to the jury on the second day of trial. Five court days after that, the jury returned its verdict, finding defendant guilty of second degree murder with use of a firearm. The court then found the prior conviction allegations to be true. Defendant was sentenced to an aggregate term of 20 years to life, comprised of the minimum 15 years for second degree murder, a 4-year enhancement for personal use of a firearm in the commission of the crime, and a 1-year enhancement for the prior convictions. He filed a timely notice of appeal.

### FACTUAL SUMMARY

We turn now to a summary of the evidence. ■ In our review, we follow the principle that, on appeal, all factual issues must be resolved in favor of the verdict and the judgment of the trial court if supported by substantial evidence in the record. (See *People* v. *Johnson* (1980) 26 Cal.3d

---

[1]All further references to sections of an undesignated code are to the Penal Code.

557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255]; *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

In the late evening or early morning of January 14-15, 1990, Linda Chavez was informed that her husband, Danny Chavez, had been killed at 255th Street and Marigold in Harbor City. She later identified the victim as her husband. She also testified that her husband drove a blue El Camino pickup, which she identified.

Los Angeles Police Department Officer Salvador Magdaleno was the first officer on the scene, arriving shortly before midnight on January 14, 1990. He went there in response to a radio call. He was familiar with the area; 255th and Marigold is a known narcotics sale area, familiarly called "The Station." Officer Magdaleno found a blue El Camino pickup on the grass, up against a building. The engine was still running, and the gear was in the "drive" position. There was a bullet hole through the tailgate of the pickup, and the rear window had been shot out or smashed out. Danny Chavez was slumped in the driver's seat, unconscious, with a large bullet hole in the back of his head. Paramedics arrived at the scene and transported Mr. Chavez to a local hospital, where he died as the result of the bullet wound he had sustained. The scene was secured, but no one was apprehended at the time.

Defendant did not testify or present a case-in-chief. The prosecution's case rested principally on out-of-court statements by two percipient witnesses, Michael Sampson and Ben Barker.

Sampson was arrested for cocaine possession on February 21, 1990, and taken to a police station, where he was questioned about the shooting. Sampson testified at trial that he is familiar with the 255th and Marigold area, that it is known as "The Station," and that he had been there at about 11 p.m. on the evening of January 14, 1990. He also testified that he was a lifelong friend of defendant, who is known as "Ant-Loc."

A statement signed by Sampson at the police station states that he was 100 feet away from the blue El Camino on "[t]he night the guy . . . got shot." The statement goes on to say that Sampson saw defendant fire a gun at the El Camino, that no one else had a gun, that the El Camino kept going straight, then turned left, went over a curb and up on a yard, and hit a house. After the shooting, defendant walked over to Sampson and said "the punk was trying to beat me." Defendant explained that the shooting was over a "dove," which is $20 worth of rock cocaine. Defendant kept walking and pointing the gun, and saying "he tried to beat me."

At trial, Sampson denied the substance of virtually everything in the signed statement. He testified that he "signed a piece of paper." He also

denied telling Detective Mejia, who was conducting the police interrogation, that he had witnessed a shooting, that he had seen defendant fire a weapon, or that he had seen the blue El Camino. He testified that he did not recall Detective Mejia going over the written statement with him. However, he admitted explaining to the detective that the term "beat me" refers to cheating over money.

The signed statement relates that after the shooting, Sampson and defendant started to leave, that defendant refused to turn over the firearm but, instead, put it in his coat, and that when they parted Sampson walked to his mother's home while defendant headed toward some apartments. Later on, Sampson saw defendant at a friend's house, but defendant said nothing. On the stand, Sampson denied saying any of these things to Detective Mejia. But he admitted that he had seen defendant "later" that night at a friend's house.

Sampson testified that he signed the statement because the officer asked him to do so. He initialed corrections on the statement for the same reason.

At the time he testified at trial, Sampson was in state prison custody on a parole violation. He had suffered two prior felony convictions, one in 1980 for auto theft and one in 1984 for first degree burglary. He also is a cocaine user and, he said, he was under the influence of that drug both on the evening of January 14, 1990, and when he spoke to Detective Mejia on February 21, 1990. He said that he has a $400-a-day drug habit. He denied saying that he would refuse to testify out of fear of reprisal in prison, but acknowledged that he was aware of reprisals visited on prisoners who "snitch" on others. He denied being a drug dealer or runner, or owning a firearm.

On cross-examination by defense counsel, Sampson testified that he was arrested on February 20, 1990, for investigation of murder, and he knew that he had a previous narcotics arrest and had "given a dirty test" to parole authorities. From all of this, he was aware that he could be sent back to prison for parole violation. He testified that a parole official informed him that if he told the police "something good" he would be allowed to return home. He agreed with the police version of what happened in order to tell them "something good." He also testified that he had given the officers the "true" version of what had happened and thought that they had written it on the statement that he signed.

Some time after signing the statement, Sampson was released from custody. He was not in custody when he testified at the felony preliminary

hearing on March 9, 1990. In his testimony at that hearing, he denied defendant had done the shooting. Shortly after the hearing, Sampson was erroneously arrested for the murder. Detective Mejia explained how the error probably had occurred: the names of persons the officers wanted to question were put into a computer, so that if any of them was stopped the investigating officer would be notified. But the officer failed to purge Sampson's name from the information in the computer following the interview. Two officers stopped Sampson and booked him for murder. The error was later corrected.

The other percipient witness, Ben Barker, also recanted earlier statements that incriminated the defendant.

Like Sampson, Barker admitted in his testimony that he was in the neighborhood of 255th and Marigold near midnight on January 14, 1990, that he had known defendant for several years, and that he had known that defendant's nickname was Ant-Loc. And, like Sampson, Barker was in state prison custody at the time he testified at defendant's trial. He was serving a six-year term for sale of cocaine, a crime for which he had been arrested on January 25, 1990.

While in custody, he signed a statement that he had seen defendant do the shooting on January 14, 1990. He testified to the same effect at defendant's preliminary hearing on February 15, 1990.

His story changed at trial. He testified that it was Sampson, not defendant, who did the shooting. Sampson, he said, is a cocaine user who supports his habit by "selling and robbing." Sampson also is a runner: he takes cocaine to a customer's car from the dealer, and takes money back to the dealer, thereby protecting the dealer from arrests. Runners also do whatever is needed in case a buyer tries to take cocaine without paying for it. He also testified that he is familiar with "The Station" but had not seen defendant selling there. In fact, defendant is not a runner at all; he is "bigger than that." Sampson, on the other hand, often runs cocaine at "The Station."

Asked about his statements to police and at the felony preliminary hearing that defendant had done the shooting, Barker said that he had been pressured by police on both occasions, and he simply told them, and the judge, what they wanted to hear. The police were putting words in his mouth and doing most of the talking. He did all of this in order to gain a release from the drug charges pending against him, and he had been told that if he cooperated he would get out of jail. At the interview, he said whatever police told him to say; he really was not doing the talking; and it would be fair to say that the police were saying things and he was "just saying yes, yes, yes."

He admitted that he had gone over the signed statement that said defendant was the shooter, and that police had read it to him. But he signed it because of pressure and to get out of jail.

Besides the narcotics felony for which Barker was serving time when he testified at trial, he also had suffered a conviction for second degree burglary in 1986.

Some of Barker's testimony was inconsistent. Asked on the witness stand whether defendant shot anyone on January 14, 1990, Barker answered "I wasn't even out there." The reason he did not tell police that Sampson had committed the crime is that he "wasn't going to tell on him." But he admitted that he "had words" with Sampson at the scene on the evening in question.

On cross-examination by defense counsel, Barker also testified that he had not seen defendant sell a $20 rock "[b]ecause he ain't no 20-dollar guy."

Detective Mejia testified at the trial, and laid a foundation for tape recordings of the out-of-court statements by Sampson and Barker. The tapes were received in evidence as exhibits, and were made available to the jury.

## DISCUSSION

## I

### *Adequacy of Court-conducted Voir Dire*

 Defendant argues that the trial court abused its discretion in the jury selection process because its voir dire failed to assure his Sixth Amendment right to trial by an impartial jury. The failure, he claims, lies in the use of closed-end questions and a failure to probe with sufficient depth into the areas of racial prejudice and attitudes about drug trafficking. After review, we conclude that these claims lack merit and, in doing so, we agree with the conclusions reached by the Fifth District on similar issues in *People* v. *Chaney* (1991) 234 Cal.App.3d 853 [286 Cal.Rptr. 79].

The voir dire in this case was conducted shortly after the enactment of Code of Civil Procedure section 223 by operation of the Proposition 115 initiative.[2] The trial judge announced that he would conduct the voir dire, rather than permit the attorneys to do so as had been the previous practice.

[2]Section 223 provides: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause,

But the judge invited counsel to offer questions and areas of inquiry for the court's voir dire. We will shortly examine the court's voir dire in greater detail. Before doing so, we briefly review the statutory development that preceded adoption of the initiative at the 1990 Primary Election.

### A. *Voir Dire in California*

For over a century preceding that election, California decisions had recognized the right of attorneys to question prospective jurors prior to the excercise of challenges. (See *People* v. *Backus* (1855) 5 Cal. 275.) But by 1912, the California Supreme Court had noted the "tedious examination of jurors" that had resulted from the "increasing tendency to prolong proceedings inordinately." (*People* v. *Edwards* (1912) 163 Cal. 752, 753 [127 P. 58].) Former section 1078 had recognized the right of attorneys to reasonably examine prospective jurors with respect to their qualifications. In a 1973 decision by Justice Tobriner, the court examined the record of voir dire practice, and concluded that "direct examination by counsel has perverted the purpose of *voir dire*, and transformed the examination of jurors into a contest between counsel for the selection of a jury partial to his cause and for the attainment of rapport with the jurors so selected, a contest which may overshadow the actual trial on the merits." (*People* v. *Crowe* (1973) 8 Cal.3d 815, 828 [106 Cal.Rptr. 369, 506 P.2d 193].) The court referred to the "inordinate time consumed" in the jury selection process, and to the observation of another court that " '[i]t is commonplace knowledge that there have been extensive abuses by counsel on *voir dire* examination' " by improper and repetitious questions. (*Id.* at p. 825.) The court concluded that the statutory requirement of reasonable examination of jurors could be accomplished by a procedure by which attorneys submit questions to the court which, in turn, would render them to the prospective jurors. (*Id.* at p. 824.) That, after all, was the federal practice, which had been in place for decades and which had been upheld against constitutional attack. (*Id.* at p. 826.)

The legislative response was not long in coming. The year after the *Crowe* decision, section 1078 was amended to insert a requirement that voir dire examination in criminal cases "be conducted orally and directly by counsel." (Stats. 1974, ch. 960, p. 2000.)

---

to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases. [¶] Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause. [¶] The trial court's exercise of its discretion in the manner in which voir dire is conducted shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

There is no indication that the problem abated after that; if anything, it appears to have become worse. In an often quoted statement, the United States Supreme Court noted that while the purpose of voir dire is to ensure a fair and impartial jury, not a favorable one, it was "inconceivable" that the jury selection process in the case before it had taken six weeks. It added, with apparent incredulity, that "in response to questions counsel stated that it is not unknown in California courts for jury selection to extend six months." (*Press-Enterprise Co.* v. *Superior Court of Cal.* (1984) 464 U.S. 501, 510, fn. 9 [78 L.Ed.2d 629, 638, 104 S.Ct. 819].)

▆▆ ▄ ▄ The length of voir dire was certainly extended by the decision in *People* v. *Williams* (1981) 29 Cal.3d 392, 398 [174 Cal.Rptr. 317, 628 P.2d 869], holding that voir dire may not be restricted to questions in aid of challenges for cause, but also must be permitted for questions to help counsel make intelligent decisions about the exercise of peremptory challenges.[3]

Overuse of jury voir dire continued to receive judicial criticism (see, e.g., *People* v. *Helton* (1984) 162 Cal.App.3d 1141, 1144 [209 Cal.Rptr. 128]) as well as other critical comment (see, e.g., Levit et al., *Expediting Voir Dire: An Empirical Study* (1971) 44 So.Cal.L.Rev. 916). In 1988, the Legislature established a Task Force on Voir Dire and pilot programs in two counties at which, for a designated period, all questions designed solely to assist in the intelligent exercise of peremptory challenges would be asked by the court. (See former Code Civ. Proc., § 223.5.)

It is in the context of this history that we review the voir dire innovations of Proposition 115.

### B. *Voir Dire Under Proposition 115*

Sections 6 and 7.5 of the initiative repealed the existing code provisions governing the conduct of voir dire in criminal cases, including those establishing the Task Force on Voir Dire and the pilot programs. Section 7 added

---

[3]No issue is raised in this case with respect to the provision in Code of Civil Procedure section 223 that voir dire only be conducted "in aid of the exercise of challenges for cause", i.e., not to aid decisions about the exercise of peremptory challenges. We note that while the right to exercise peremptory challenges has ancient antecedents in the law (see *People* v. *Williams, supra,* 29 Cal.3d at p. 404), it is not a constitutional right. (*Ross* v. *Oklahoma* (1988) 487 U.S. 81, 88 [101 L.Ed.2d 80, 89-90, 108 S.Ct. 2273].) We need not, and we do not, further address questions about the use of voir dire to aid the use of peremptory challenges.

Code of Civil Procedure section 223.[4] As pertinent to this discussion, the statute provides that in criminal cases, "the court shall conduct the examination of prospective jurors." On a showing of good cause, however, the court may permit the parties "to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper."[5]

The new provision is obviously adapted from the federal practice, embodied in Federal Rules of Criminal Procedure, rule 24(a).[6] While the federal rule came out of a 1924 recommendation of the Judicial Conference of Senior Circuit Judges (see *People* v. *Crowe, supra*, 8 Cal.3d at p. 826), the Fourth Circuit observed, in 1925, that "[t]he practice [of court-conducted voir dire] is one which has been followed in many districts from time out of mind." (*Ungerleider* v. *United States* (4th Cir. 1925) 5 F.2d 604, 605; see also *Hamer* v. *United States* (9th Cir. 1958) 259 F.2d 274, 279 [citing earlier cases].) The constitutionality of the practice has been consistently upheld. (See *Falter* v. *United States* (2d Cir. 1928) 23 F.2d 420, 426; *United States* v. *Anderson* (8th Cir. 1970) 433 F.2d 856, 858.)

## C. *Voir Dire in This Case*

The voir dire in this case was conducted on June 14, 1990, some eight days after the voters approved Proposition 115. At that time, the trial judge said that he proposed to follow the mandate of the initiative and conduct the voir dire and that, absent a showing of good cause, he did not intend to permit the attorneys to ask questions directly. He added, however, that he had "agreed to ask virtually anything they [the attorneys] want me to ask, and they've given me a laundry list of subject areas. [¶] I have told them at the conclusion of my voir dire, I will turn to them to ask them if they pass for cause. [¶] If at that time they want me to go further as to either an individual juror or as to the subject matter, they can or one or the other can ask for a bench conference."

While defense counsel objected to this application of the initiative to a pending case, no challenge on that ground is raised on appeal. ▮ Nor

---

[4]The ballot pamphlet argument in favor of the initiative discusses the problems of trial court delays and "drawn-out jury service," but does not explicitly refer to the conduct of voir dire. (Ballot Pamp., argument in favor of Prop. 115 as presented to the voters, Primary Elec. (June 5, 1990) p. 34.)

[5]Defense counsel argued that there was good cause in this case to permit him to personally voir dire the jury. His request was denied, and no issue on that ruling is advanced on appeal.

[6]The rule provides: "The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper."

could such a challenge be effectively raised, since the Supreme Court has determined that new Code of Civil Procedure section 223 is one of the provisions of Proposition 115 applicable to cases, such as this, that were pending when that measure was adopted. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 299, 300 [279 Cal.Rptr. 592, 807 P.2d 434].)

■ While the record does not report details of the "laundry list" submitted by counsel, its contents may be inferred from the questions asked of prospective jurors by the court. The initial panel of 12 prospective jurors in the jury box, and almost every person later called into the box, was asked questions about attitude toward the use and abuse of guns and narcotics (since abuse of both was indicated in the case), and whether they or close friends or relatives had been victims of crime or had been arrested or prosecuted for a crime, or were members of a law enforcement agency. The initial panel also was asked whether any of its members would give special credence to the testimony of a police officer, and several persons later called to the box were asked whether they would draw an inference against defendant if he did not testify. Everyone was asked about the effect of a prior conviction on credibility of a witness. The initial panel also was informed about the presumption of innocence and the prosecution's burden to prove guilt beyond a reasonable doubt.

The trial judge inquired about racial bias. Addressing the prospective jurors, he said, "[n]ow, in this case, it's apparent that Mr. Taylor is Black, an Afro-American, African American. The alleged victim in this case, I think it will become apparent, is Hispanic. [¶] One of our guiding principles in this courtroom, indeed in every courtroom, is that race, creed, color, religion, national origin, none of these things counts for or against anybody. These are neutral factors, except as they might play a part in identifying somebody, as a point of identification. [¶] People don't get found guilty, they don't get found not guilty because of race, creed, color, religion, national origin and so forth. [¶] Do any of you have any quarrel with that principle, any quarrel with that at all?"

The record indicates that each of the 12 persons in the jury box answered in the negative.

The court went on: "I'm going to assume, because I am human and I have my own biases and prejudices, that some of you may have some biases and prejudices. But as a judge, I am required to put aside whatever feelings I might have and to be neutral in making decisions. [¶] I have to require you folks to do the same thing. [¶] Do any of you have any quarrel with that principle?"

Again, the record indicates that each of the 12 persons called at that point answered in the negative.

Each person called to the jury box upon the excusing of a potential juror, and each of the alternates, was asked whether he or she would answer these questions the same way, and each said that he or she would do so.

Whenever a prospective juror answered a question in a manner that indicated that further inquiry was needed, such as by stating that he or she did have friends or relatives who were members of a law enforcement agency, or that the prospective juror or a friend or relative had been prosecuted for a crime or had been the victim of a crime, the court asked follow-up questions, generally culminating with questions as to whether the particular matter would interfere with the prospective juror's ability to fairly judge the case.

Two potential jurors gave answers indicating bias. One asked for a discussion at the bench, at which he acknowledged that he was "prejudiced." He was excused by stipulation. Another was excused by stipulation when he qualified his statement that he could be neutral by adding that he was against guns, drugs "and everything," and said that he would rather not serve on the panel. Each side passed for cause on the original panel, and on each person subsequently called to the jury box, other than the two who were excused by stipulation. Since defendant was facing an indefinite life term for murder, each side had 20 peremptory challenges. (Code Civ. Proc., § 231, subd. (a).) The prosecution exercised four challenges and the defense exercised eighteen challenges. ■ ■ Both sides passed for cause on the two alternates, and there were no peremptory challenges to the alternates.[7]

Most significantly, neither attorney ever asked the court to pose further questions to any prospective juror or to the entire panel, or suggested a

---

[7]The Attorney General invokes the rule that a defendant who does not exercise all of his or her peremptory challenges, loses the right to complain about jury selection on appeal. That doctrine is generally applied when a defendant's challenge for cause is erroneously denied, and the defendant accepts the jury panel still having at least one peremptory challenge that could have been used to excuse the juror who was the subject of the challenge for cause. (See *People* v. *Coleman* (1988) 46 Cal.3d 749, 768 [251 Cal.Rptr. 83, 759 P.2d 1260].) *People* v. *Morales* (1988) 203 Cal.App.3d 970, 975 [250 Cal.Rptr. 240] is correctly cited for the proposition that the rule should apply to failure to exercise peremptory challenges after an improper limitation of voir dire. But *Morales* and the Supreme Court case it cites, *People* v. *Tyren* (1919) 179 Cal. 575, 577 [178 P. 132], involved a restriction in attorney voir dire of particular prospective jurors. Only one case, *People* v. *Hernandez* (1979) 94 Cal.App.3d 715, 719 [156 Cal.Rptr. 572], appears to apply the rule where there was no opportunity to examine a prospective juror. We do not believe the rule has application where, as in this case, the issue on appeal goes to an overall limitation of voir dire.

subject to further inquiry for anyone. The Attorney General argues that the failure of the defense to do so effects a waiver of any complaint about voir dire on this appeal. That is a credible argument. (See *People* v. *Woods* (1991) 226 Cal.App.3d 1037, 1055 [277 Cal.Rptr. 269], and authority cited.) Nevertheless, we review the substance of defendant's claim in light of the fact that the new procedure applied by the court was based on a law that became effective only days before, and in order to foreclose a collateral challenge based on a claim of inadequate representation by counsel. (See *People* v. *Cox* (1991) 53 Cal.3d 618, 682 [280 Cal.Rptr. 692, 809 P.2d 351].)

### D. *Voir Dire on Racial Bias*

■ As we have seen, defendant's argument is that the trial court conducted an ineffective voir dire examination in that its questions generally called for "yes" or "no" answers, rather than being open-ended in form, that the court signalled the "correct" answer in its preface to the questions asked, and that the court did not ask questions about possible perceptions relating to Black persons and drug trafficking.

We begin with some general observations about voir dire.

■ First, "[t]he right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to a trial by jury guaranteed by the constitution." (*Lombardi* v. *California St. Ry. Co.* (1899) 124 Cal. 311, 317 [57 P. 66], quoted in *People* v. *Galloway* (1927) 202 Cal. 81, 92 [259 P. 332].) And "in carrying out its duty to select a fair and impartial jury . . . , the trial court is not only permitted but required by inquiry sufficient for the purpose to ascertain whether prospective jurors are, through the absence of bias or prejudice, capable of participating in their assigned function in such fashion as will provide the defendant the fair trial to which he is constitutionally entitled." (*People* v. *Fimbres* (1980) 104 Cal.App.3d 780, 788 [163 Cal.Rptr. 876].) Voir dire is critical to assure that the Sixth Amendment right to a fair and impartial jury will be honored. "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." (*Rosales-Lopez* v. *United States* (1981) 451 U.S. 182, 188 [68 L.Ed.2d 22, 28, 101 S.Ct. 1629].)

Second, bias is seldom overt and admitted. More often, it lies hidden and beneath the surface. An individual juror "may have an interest in concealing his own bias [or] may be unaware of it." (*Smith* v. *Phillips* (1982) 455 U.S. 209, 221, 222 [71 L.Ed.2d 78, 89, 102 S.Ct. 940] (conc. opn. by O'Connor, J.) To paraphrase an earlier statement by this court, made in the context of attorney voir dire, "[b]ecause racial, religious or ethnic prejudice or bias is a thief which steals reason and makes unavailing intelligence—and sometimes

even good faith efforts to be objective—trial judges [must, where appropriate, be willing to ask] prospective jurors relevant questions which are substantially likely to reveal such juror bias or prejudice, whether consciously or unconsciously held." (*People* v. *Wells* (1983) 149 Cal.App.3d 721, 727 [197 Cal.Rptr. 163].)

Third, the conduct of voir dire is an art, not a science. It is possible and appropriate to establish guidelines and examples for appropriate voir dire, and this has been done.[8]

"There is no single way to *voir dire* a juror." (dis. opn. of Kennedy, J., in *Mu'Min* v. *Virginia* (1991) 500 U.S. __ [114 L.Ed.2d 493, 522, 111 S.Ct. 1899, 1919].) Sometimes a broad question or statement will elicit responses that call for follow-up questions which eventually disclose a bias. Or the prospective juror's response may be innocuous in words, yet uttered with such hesitation or expression as to signal a basis for further questioning.

In a system of court conducted voir dire, the role of the attorney remains significant, even vital. Counsel are present, and observe the text and manner of the prospective jurors' answers and reactions to questions, and to the responses of other prospective jurors. Based on these voluntary and involuntary responses, the facts and issues of the case, and their own skill and experience, counsel may formulate specific questions and areas of inquiry for further questioning by the court. An attorney is not relegated to reposing in the courtroom like the now proverbial potted plant. The statute calls for the participation we are suggesting. And in this case, it was specifically invited by the trial judge.

■ Finally, the exercise of discretion by trial judges with respect to the particular questions to ask and areas to cover in voir dire is entitled to considerable deference by appellate courts. Addressing the deference accorded federal judges under rule 24(a), the United States Supreme Court has observed that "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*." (*Rosales-Lopez* v. *United States*, *supra*, 451 U.S. 182, 189 [68 L.Ed.2d 22, 29].) And "[d]espite its importance, the adequacy of *voir dire* is not easily subject to appellate

---

[8]See, for example, Standards of Judicial Administration Recommended by the Judicial Council, section 8.5 (Examination of Prospective Jurors in Criminal Cases). This section, revised effective June 6, 1990, in anticipation of the adoption of Proposition 115, includes the following statement and question: "(18) (*When appropriate*). It may appear that one or more of the parties, attorneys or witnesses come from a particular national, racial or religious group (or may have a life-style different than your own). Would this in any way affect your judgment or the weight and credibility you would give to their testimony?" (Appen. to Cal. Rules of Court, div. I.)

review." (*Id.* at p. 188 [68 L.Ed.2d at p. 28].) In its most recent expression on the issue, the high court reiterated these views. (*Mu'Min* v. *Virginia, supra,* 500 U.S. __, __ [114 L.Ed.2d 493, 505, 111 S.Ct. 1899, 1904.)

The determination of the trial court, and the appellate deference to which it is entitled, is not unlike that accorded to the resolution of a challenge to the use of peremptory challenges to prospective jurors on a claim of bias against a cognizable group, under the doctrine of *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. As in that situation, the trial judge, aided by the advocacy of counsel, is in the best position to assess the amount of voir dire required to ferret out latent prejudice, and to judge the responses. And as in that case (see *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1221 [255 Cal.Rptr. 569, 767 P.2d 1047]), the decision of a trial judge is entitled to great deference.

The findings of a trial judge on the issue of juror impartiality should be upheld absent " 'manifest error.' " (See *Patton* v. *Yount* (1984) 467 U.S. 1025, 1031 [81 L.Ed.2d 847, 854, 104 S.Ct. 2885]; *Mu'Min* v. *Virginia, supra,* 500 U.S. __, __ [114 L.Ed.2d 493, 508, 111 S.Ct. 1899, 1907].) And the failure to ask specific questions is reversible only on a showing of abuse of discretion: questioning that is not reasonably sufficient to test the jury for bias or partiality. (*United States* v. *Jones* (9th Cir. 1983) 722 F.2d 528, 529; *People* v. *Chaney, supra,* 234 Cal.App.3d 853, 861.)

But with the heightened authority of the trial court in the conduct of voir dire, mandated under Proposition 115, goes an increased responsibility to assure that the process is meaningful and sufficient to its purpose of ferreting out bias and prejudice on the part of prospective jurors.

United States Supreme Court jurisprudence in this area was extensively reviewed in *Mu'Min* v. *Virginia, supra,* 500 U.S. __ [114 L.Ed.2d 493, 111 S.Ct. 1899]. The claim of error in *Mu'Min* was that the trial court had not made sufficient inquiry of prospective jurors to determine whether they had been tainted by pretrial publicity. The case arose out of a highly publicized murder, which allegedly was committed by a work detail prisoner. The trial judge asked the prospective jurors whether they had acquired any information about the crime or the accused from news media or from any other source. To those who answered in the affirmative, the trial court asked whether any of the information acquired would affect the juror's impartiality, and whether they could "enter the Jury box with an open mind and wait until the entire case is presented before reaching a fixed opinion or a conclusion as to guilt or innocence of the accused." But the trial court refused defense requests to ask those jurors who had heard or read information about the case from media sources, about the source or content of their prior knowledge. (500 U.S. at p. __ [114 L.Ed.2d at p. 502, 111 S.Ct. at p. 1902].)

The Supreme Court noted that its decisions about the adequacy of voir dire fell into two categories: those arising from federal court trials, in which the court exercised supervisorial power with respect to the scope and intensity of voir dire, and those arising from state court decisions, in which the court was restricted to assuring adherence to constitutional standards. (500 U.S. at p. __ [114 L.Ed.2d at p. 503, 111 S.Ct. at p. 1903].) Two parallel themes emerged from a review of these lines of cases: the possibility of racial prejudice against a Black defendant charged with a violent crime against a White person is sufficiently real that the Fourteenth Amendment "requires that inquiry be made into racial prejudice"; and that "the trial court retains great latitude in deciding what questions should be asked on *voir dire.*" (500 U.S. at p. __ [114 L.Ed.2d at p. 505, 111 S.Ct. at p. 1904].)

The court recognized that "content" questions, asking prospective jurors about what they read or heard concerning the crime, would materially assist in obtaining an untainted jury. But the court concluded that such questions are not constitutionally required. "Questions about the content of the publicity to which jurors have been exposed might be helpful in assessing whether a juror is impartial. To be constitutionally compelled, however, it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." (500 U.S. at p. __ [114 L.Ed.2d at p. 506, 111 S.Ct. at p. 1905].)

Just as the trial court was not required to ask "content" questions in the context of pretrial publicity in *Mu'Min,* the trial court was not required to ask "open-ended" questions in this case. Such questions might have been helpful, even desirable. But no case cited to us, or which we have found, has held that open-ended questions always must be asked to eliminate the possibility of bias.[9] What the cases do establish is that an interracial crime is a "special circumstance" in which inquiry about racial prejudice must be made.

In its most recent decision on voir dire to discover racial prejudice, the court held that a "capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." (*Turner* v. *Murray* (1986) 476 U.S. 28, 36, 37 [90 L.Ed.2d 27, 37, 106 S.Ct. 1683].) The court went on to say that "[t]he rule

---

[9]Defendant cited *United States* v. *Dellinger* (7th Cir. 1972) 472 F.2d 340, in which the court held that the trial court's voir dire about pretrial publicity concerning the defendants was inadequate. In that case, which arose out of protest demonstrations at the 1968 Democratic National Convention, the court responded to a request for continuance due to publicity with an assurance that it would cover the area in voir dire. Instead, it confined itself (on this subject) to asking the panel whether anyone knew of any reason he or she could not be fair to the defendants. That broad question was held to be insufficient under the circumstances of the case. (*Id.* at pp. 366, 370, 373-375.)

we propose is minimally intrusive; as in other cases involving 'special circumstances,' the trial judge retains discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively." (*Id.* at p. 37 [90 L.Ed.2d at p. 37]; quoted in *People v. Kelly* (1992) 1 Cal.4th 495, 518-519 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

Reviewing its decisions in *Aldridge* v. *United States* (1931) 283 U.S. 308 [75 L.Ed. 1054, 51 S.Ct. 470, 73 A.L.R. 1203] (the "seminal case requiring inquiry as to racial prejudice," *Mu'Min* v. *Virginia, supra,* 500 U.S. at p. ___ [114 L.Ed.2d at p. 506, 111 S.Ct. at p. 1905]) and *Ham* v. *South Carolina* (1973) 409 U.S. 524 [35 L.Ed.2d 46, 93 S.Ct. 848], each of which required that some inquiry be made about racial prejudice in light of the "special circumstances" presented, the *Mu'Min* court recalled that its holding was "that the subject of possible racial bias be 'covered' by the questioning of the trial court in the course of its examination of potential jurors, but we were careful not to specify the particulars by which this could be done. We did not, for instance, require questioning of individual jurors about facts or experiences that might have led to racial bias." (500 U.S. at p. ___ [114 L.Ed.2d at p. 509, 111 S.Ct. at p. 1908].)

We do not say that open-ended questions would have been inappropriate in this case, or that they may not be required in some cases. We do say that they were not constitutionally compelled in this case. We also do not accept defendant's claim that the voir dire was improper because the court preceded some of its questioning (including the voir dire on racial prejudice) with statements that "signaled" the proper answer. It is not error for a judge to remind prospective jurors that racial prejudice has no place in the courtroom. As Justice Kennedy observed in *Mu'Min*, a trial judge may choose to ask what information a prospective juror has about a subject, but "the judge can also evaluate impartiality by explaining the trial processes and asking general questions about the juror's commitment to follow the law and the trial court's instructions." (*Mu'Min* v. *Virginia, supra,* 500 U.S. at p. ___ [114 L.Ed.2d at p. 522, 111 S.Ct. at p. 1919], dis. opn. of Kennedy, J.)

Having said this, we must also say that the court should have made further inquiry in the area of possible racial bias against defendant.

As we have discussed, the trial judge asked the prospective jurors if any of them had any quarrel with the principle that no one should be found guilty because of race, creed, color, religion or national origin. The judge also asked whether they would put aside any biases and prejudices they may have had. But the court asked no questions designed to elicit whether any juror actually held such bias. In a case such as this, where there is a potential of racial or other invidious prejudice against the defendant, a further inquiry should be made.

The failure to do so in this case is harmless, for two reasons. First, the trial court repeatedly emphasized the importance of juror neutrality and a fair trial. Second, both counsel were specifically invited to ask the court to conduct further voir dire on any proper subject, including possible racial bias, but were satisfied that it was not necessary to do so.

Finally, we find no support for defendant's claim that the trial court was required to ask, sua sponte, whether prospective jurors thought that Black persons were more involved in drug trafficking than other persons. (See *People* v. *Chaney, supra,* 234 Cal.App.3d 853, 862.)

E. *Conclusion*

Both defense counsel and the prosecutor participated in the voir dire by presenting a "laundry list" of matters about which the trial judge was asked to inquire. Both were interested in a fair trial, and the client of each was entitled to nothing less. Both attorneys watched and listened as the trial judge made the statements, asked the questions, and received the answers we have been discussing. Each had been invited to approach the bench and suggest further questioning for the panel or for any particular juror or jurors. Neither made that request. We infer that each was satisfied with the impartiality of the jury on all pertinent issues, including possible racial bias. We have no reason to believe that they were wrong.

II, III*

. . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment of conviction is affirmed.

Woods (A. M.), P. J., and Cooper, J.† concurred.

Appellant's petition for review by the Supreme Court was denied July 22, 1992.

---

*See footnote, *ante,* page 1299.
†Judge of the Municipal Court for the Los Angeles Judicial District sitting under assignment by the Chairperson of the Judicial Council.