Filed 1/27/16  P. v. West CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOSHUA SCOTT WEST,<br><br>    Defendant and Appellant. | F068905<br><br>(Super. Ct. No. 12CM3571)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

Eileen S. Kotler, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Lewis A. Martinez and Amanda D. Cary, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

A jury convicted defendant Joshua Scott West on five counts, including four sexual offenses on a minor: sodomy of B.S., a child under the age of 10 by a person over the age of 18 (Pen. Code, § 288.7, subd. (a), count 1),[1] sodomy of B.S., a child under the age of 14 and more than 10 years younger than defendant (§ 286, subd. (c)(1), count 2),[2] lewd and lascivious conduct against B.S., a child under the age of 14 (§ 288, subd. (a), count 3), lewd and lascivious conduct against M.G., a child under the age of 14 (§ 288, subd. (a), count 4), and maliciously and with force preventing or dissuading a victim, M.G., from acting (§ 136.1, subd. (c)(1), count 5).

The jury also found true multiple enhancement allegations: defendant personally inflicted great bodily injury on B.S., who was under 14 years of age (§ 667.61, subds. (a), (c), (d)(7)), he had two prior convictions within the meaning of section 667.61, subdivisions (a), (c), and (d)(1), and committed an offense specified in subdivision (c) against more than one victim (§ 667.61, subds. (b), (c), and (e)(4)), and he had two prior serious felony convictions (§ 667, subd. (a)(1)). In addition, the jury found true allegations defendant had two prior serious or violent felony convictions within the meaning of the three strikes law (§§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)).

Defendant was sentenced to an aggregate prison term of 175 years to life plus 10 years.

On appeal, defendant contends the manner in which the trial court conducted voir dire did not permit defense counsel to sufficiently test prospective jurors for bias. We disagree and affirm the judgment.

---

[1]All undesignated statutory references are to the Penal Code unless otherwise indicated.

[2]We note the abstract of judgment indicates defendant was convicted of section 288, subdivision (c)(1) pursuant to count 2. This is incorrect. Defendant was convicted of violating section 286, subdivision (c)(1) in count 2. We will order the abstract of judgment amended to reflect the correct Penal Code section.

In addition, we also observe the abstract of judgment fails to indicate defendant's sentences pursuant to counts 1, 4, and 5 are consecutive. We will order this corrected as well.

# FACTUAL AND PROCEDURAL BACKGROUND

**The Prosecution**

### *B.S. (Counts 1, 2, and 3)*

On September 30, 2012, four-year-old B.S. was visiting his mother K.V. at a motel where K.V. was living with defendant. K.V. was bathing B.S. in the bathtub when she left the bathroom to get some soap. After she stopped to watch television momentarily, defendant entered the bathroom.

K.V. heard B.S. crying loudly and asked defendant what happened. Defendant told her B.S. slipped in the tub and fell. B.S. told K.V. he wanted to go home. As B.S. waited for his ride, he began to act uncharacteristically clingy with K.V. Defendant asked B.S. for a hug, but B.S. refused.

B.S. returned to his grandmother's home, where he lived. His grandmother observed B.S. acting unusually quiet and clingy. The next day, as she was helping B.S. in the bathroom, he told her "[his] butt hurts." B.S.'s grandmother observed mucous and runny feces inside the toilet bowl.

Around 7:00 p.m. that evening, B.S.'s grandmother noticed B.S. was not acting like himself and asked him what was wrong. He told her he was scared of defendant "'[b]ecause Josh put his wee-wee in my butt.'" B.S.'s grandmother asked him to lie on his back so she could look at his bottom. B.S.'s rectum appeared to be dilated to the size of a quarter and was bright red. B.S.'s grandmother dressed B.S. and took him to the hospital.

Dr. Darryl Boulton, an emergency room physician, examined B.S. He noted B.S.'s anus was red, open, and dilated, which is an abnormal condition. In Dr. Boulton's opinion, B.S.'s injuries were consistent with a sexual assault. The hospital reported the incident to the sheriff's department and filed a report with child protective services (CPS).

3.

K.V. confronted defendant about what B.S. told his grandmother. Defendant denied doing anything to B.S., but began angrily pacing back and forth and said he could not go back to prison and stated the incident would count as another strike against him.

Around midnight, Kings County Sheriff's deputies went to defendant's motel room to arrest him. Deputies found defendant on the roof of the motel and told him to come down. Defendant responded, "'Fuck you, I'm not coming down.'" Deputy Jeremiah Gilson climbed onto the roof and observed defendant holding a knife to his own neck.

Defendant told Gilson he did not want to go back to prison, he would rather kill himself. Defendant stated he knew B.S.'s grandmother had taken him to the hospital and the incident was reported to the police and CPS. He told Gilson he knew having B.S. in his residence was a violation of his parole and he would be going back to prison as a result. Gilson eventually convinced defendant to put the knife down and took him into custody.

During police questioning, defendant claimed K.V. asked him to bathe B.S. Defendant was showering with him, unclothed, when B.S. slipped and fell on his buttocks. B.S. began screaming and crying after he fell so defendant picked him up, rinsed him off, wrapped a towel around him, and handed him to K.V. Defendant denied responsibility for B.S.'s injuries. He stated when K.V. told him CPS was contacted, he knew the police were going to be coming for him and he was going to jail because he had violated his parole by having a child in his residence.

On October 2, 2012, Jennifer Pacheco, a registered nurse, family nurse practitioner, and forensic nurse examiner, performed a forensic examination on B.S. At trial, Pacheco explained if B.S. had fallen in the shower, she would expect to see bruising on his buttocks. Instead, Pacheco observed redness, lacerations, and bruising around B.S.'s anus. Pacheco testified B.S.'s injuries and symptoms were consistent with anal penetration.

4.

On October 18, 2012, Pacheco performed a follow-up examination on B.S. During the examination, Pacheco noted B.S. had scarring around his anus, as well as other injuries and symptoms consistent with anal penetration, including a prolonged period of diarrhea following the incident. According to Pacheco, B.S.'s injuries would not have been caused by slipping and falling in the bathtub.

### M.G. (Counts 4 and 5)

Denise R. dated defendant from August 2011 to February or March 2012. During this time, defendant would come over to her apartment every day after he got off work. Denise R. had two young daughters, eight-year-old M.G., and M.G.'s two-year-old sister. Defendant babysat the children on weekends when Denise R. had to work and her sister was unable to watch the children.

One day, M.G. and defendant were home alone sitting in the living room. Defendant told M.G. to sit on his lap. When M.G. complied, defendant put his hand down her pants, outside of her underwear, and touched her vagina. M.G. got up and walked into her bedroom. Defendant followed her and told her he would hurt her if she told anyone. M.G. did not disclose the incident because she feared defendant would hurt her mother and younger sister.

Denise R. broke up with defendant after she discovered he was a registered sex offender. In October 2012, she received a Facebook message from a former coworker, informing her defendant had been arrested for sexually assaulting B.S. Denise R. asked M.G. whether defendant had ever done anything bad to her. M.G. began to cry and told Denise R. defendant had touched her. Denise R. reported the incident to police.

**The Defense**

In September 2002, when defendant was 17 years old, he pled no contest to two counts of committing a lewd act on his younger sister, a child under the age of 14, and was sentenced to eight years eight months in prison. A condition of his parole required him to wear an ankle monitor and prohibited him from having any contact with minors.

Defendant testified he ended his relationship with Denise R. because she was sleeping with another man. He admitted during the time he dated Denise R., he had regular contact with M.G. and her younger sister. Defendant claimed he told Denise R. he wore an ankle monitor because his sister had made allegations of inappropriate sexual contact, and he had served nearly nine years in prison as a result of the incident. He also claimed he told her he was a convicted sex offender.

Defendant denied touching M.G. in an inappropriate manner or threatening to hurt her. He stated Denise R.'s accusations were based on a desire to make him look bad because she is a spiteful woman. He admitted to knowingly violating his parole by dating Denise R. because he was prohibited from dating anyone who had physical custody of children. He also denied babysitting M.G. and claimed she never sat on his lap.

Defendant also denied touching B.S. inappropriately. He testified he was completely forthcoming with K.V. about the reason he had gone to prison. On the evening of September 30, 2012, defendant stated he came back to his motel room and decided to take a shower. As he was about to get into the shower, he claimed K.V. told him to wash B.S. Defendant complied, and as he was washing B.S., he accidentally dropped him because B.S. was slippery from the body wash defendant used to clean him. Defendant claimed after B.S. "[f]ell on his ass and cried," K.V. came into the bathroom, and he handed B.S. to her.

**Voir Dire Proceedings**

Prior to conducting voir dire of the venire panel, the trial court advised counsel it intended to conduct 90 to 95 percent of the voir dire, including questioning concerning any biases related to the sexual nature of the case. Counsel would then be permitted to ask the panel questions, but if counsel wanted to ask each prospective juror the same question, the question would be posed to the panel rather than each juror individually.

If counsel wanted to ask questions different from what the court asked, they would be permitted to do so. Counsel would also be permitted to question prospective jurors

individually about any comments made during the process. However, in the interest of expediency, if counsel wanted to ask a question the court had already asked, they would have to approach the bench and explain why it was necessary.

Counsel for both sides confirmed they understood the procedure and the trial court proceeded with voir dire. The court asked whether the jurors had any hardships and questioned the jurors for cause. During this process, three jurors were dismissed. At the conclusion of the court's questioning, both the prosecution and the defense were permitted to question prospective jurors for cause.

During the jury selection process, attorneys for both the prosecution and defense may challenge potential jurors for cause or may pass for cause. Counsel may challenge a prospective juror for cause where there is a legally cognizable basis to believe the juror does not appear capable of rendering a fair and impartial verdict. Unlike peremptory challenges, which are limited, both the prosecution and defense may exercise an unlimited number of challenges for cause. The trial court has the discretion to grant or deny the challenge. If an attorney decides to "pass for cause," he or she is allowing the juror to go unchallenged.

Defense counsel did not ask any questions before passing for cause. The prosecution asked two questions. The prosecution exercised one peremptory challenge and defense counsel exercised two. After both sides passed on further challenges, the 12-member jury panel was sworn in with three alternate jurors.

## DISCUSSION

Defendant contends the trial court conducted constitutionally inadequate questioning of prospective jurors concerning possible biases arising from the inflammatory and emotional nature of his case. We disagree.

Because the trial court "is in the best position to assess the amount of voir dire required to ferret out latent prejudice, and to judge the responses" (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1314), it has wide discretion in conducting voir dire in areas

7.

of inquiry that might disclose juror bias and "'in deciding what questions should be asked on *voir dire*.'" (*People v. Cleveland* (2004) 32 Cal.4th 704, 737.)  It abuses that discretion if its failure to ask questions renders the defendant's trial "'fundamentally unfair'" or "'"if the questioning is not reasonably sufficient to test the jury for bias or partiality."'" (*Ibid*.)

To the extent defendant asserts the manner in which the trial court questioned prospective jurors precluded him from determining their potential biases, he forfeited his claim by failing to object below.  "A defendant ordinarily cannot obtain appellate relief based upon grounds that the trial court might have addressed had the defendant availed himself or herself of the opportunity to bring them to that court's attention." (*People v. Fuiava* (2012) 53 Cal.4th 622, 655.)  Although defendant maintains the issue is, nonetheless, reviewable on appeal because any objection would have been futile, he does not cite to any evidence in the record to support his assertion.

Defendant contends in the event this court finds his claim was forfeited, defense counsel rendered ineffective assistance of counsel by failing to object and declining to exercise further peremptory challenges.  Great deference is afforded to counsel's tactical decisions, and a defense attorney's failure to object will rarely support a finding of ineffective assistance of counsel.  (*People v. Jones* (2009) 178 Cal.App.4th 853, 860.)  Such deference is appropriate here, where the record does not demonstrate any compelling reasons for defense counsel to have objected to the court's questioning or to have exercised further peremptory challenges.

Moreover, even if defendant's claim were properly before us, it fails on the merits.  For the reasons set forth below, there is no evidence in the record suggesting the jury was unfair or biased, or that defendant's fundamental rights were compromised.

1.      **Prospective Jurors Nos. 146781, 146905, 154325**

Defendant first complains the trial court violated his constitutional right to an impartial jury by conducting voir dire in a leading manner insufficient to allow counsel to

challenge jurors for cause. Defendant specifically asserts several incidents support his claim the trial court asked prospective jurors improper leading questions, rendering his trial fundamentally unfair.

The first incident occurred after Prospective Juror No. 146781 told the court he knew the investigator for the prosecution, Officer Robert Balderama, because their children had played in Little League together. The judge asked the juror, "[If] Balderama testifies, are you going to believe him over anybody else just because you know him from Little League?" The juror said he would not.

Later, during the voir dire process, the judge asked potential jurors whether they were acquainted with any of the witnesses. When Prospective Juror No. 146781 indicated a second time he was acquainted with Balderama, the court asked him, "[A]bout Officer Balderama, you're not going to give his testi[mony] any greater weight than anybody else?" The juror replied he would not.

The second incident occurred after the judge read the information to the jury and asked whether the nature of the charges would make it difficult for any of the prospective jurors to act fairly and impartially. Prospective Juror No. 146905 indicated she had a problem ignoring defendant's prior convictions. The court proceeded to question Prospective Juror No. 146905 extensively about whether she could refrain from prejudging the case. She indicated the problem was the emotional nature of the case. The court responded by asking her, "So you would let your emotions control how you vote irrespective of what the evidence is?" The prospective juror responded she did not know how she was going to react.

The court explained to Prospective Juror No. 146905 she would have to refrain from prejudging the case and must vote based on the evidence presented. The court asked whether she could render "a reasonable, rational, intelligent decision based upon the evidence that's presented," and she replied affirmatively.

9.

Lastly, Prospective Juror No. 154325 told the court she knew the prosecutor because she was her customer every Saturday at the restaurant where she worked. The court asked the prospective juror, "[Y]ou're not going to vote one way or—well, let's say that she doesn't prove this case beyond a reasonable doubt and you—you make that decision and you vote that direction, and then she comes in on Saturday, how are you going to feel?" The prospective juror responded it would not affect her ability to do her job.

Pursuant to standard 4.30(c) of California Standards of Judicial Administration, when counsel examines prospective jurors, "the trial judge should not permit counsel to attempt to precondition the prospective jurors to a particular result or allow counsel to comment on the personal lives and families of the parties or their attorneys." Defendant asserts under standard 4.30(c), the trial court asked the prospective jurors improper leading questions.

Although we note the authority defendant cites to applies to an attempt by *counsel* to elicit a particular response, rather than the court, we find the court's questions were adequate as posed. Additionally, each prospective juror gave a clear and unequivocal indication he or she would render a decision regarding defendant's guilt or innocence based on the evidence presented. We find no evidence in the record to suggest any of the prospective jurors would be unable to do so.

2.      **Prospective Juror No. 151026**

Defendant also argues the court failed to disclose the nature of its relationship with Prospective Juror No. 151026. The court asked the prospective jurors about their prior jury service. In response, Prospective Juror No. 151026 informed the court she had previously served on a jury. The court replied, "That's right, and I know that. I already knew that that's what it was. You know how I knew that, right? Because we—we've met before, have we not?" Prospective Juror No. 151026 confirmed they had met previously. The court asked the prospective juror, "[T]he fact that you and I were

10.

acquainted at one time with one another wouldn't have any affect whatsoever on your ability to sit as a juror, correct?" Prospective Juror No. 151026 replied it would not.

We find no suggestion the trial judge's prior acquaintanceship with Prospective Juror No. 151026 created the appearance of impartiality in violation of Code of Civil Procedure section 170.1, which provides a judge shall be disqualified if "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) If defendant had any doubt about Prospective Juror No. 151026's ability to fulfill her duties as a jury member, defense counsel could have questioned her about the nature of her relationship with the judge. Nothing in the record suggests further inquiry by defense counsel would have alienated the court, as defendant argues.

**3.     Prospective Jurors Nos. 157575, 146781, and 176412**

Defendant raises other issues in his brief, including (1) the trial court did not question Prospective Juror No. 157575 about how he knew the father of a witness for the prosecution at trial, Gilson; (2) the nature of Prospective Juror No. 146781's relationship with law enforcement was unexplained; (3) multiple jurors knew individuals or had family members who were sexually assaulted; and, (4) Prospective Jurors Nos. 176412 and 146781 were friends and saw each other a few times a year.

Each prospective juror indicated he or she would have no problem rendering a fair and impartial decision in the instant case. As previously explained, if defendant had any doubt as to whether the potential bias of any prospective juror was sufficiently probed by the trial court, counsel had the opportunity to ask additional questions, to challenge prospective jurors for cause, and to exercise additional peremptory challenges. Indeed, the only inference to be drawn from defense counsel's failure to do so is he concluded the prospective jurors were capable of rendering a fair and impartial decision. Any suggestion jury members would be unable to do so simply because they had a friend,

11.

family member, or acquaintance suffer sexual abuse, knew someone in law enforcement, or knew the father of one of the witnesses for the prosecution, is pure speculation.

### 4.     Six Prospective Jurors

Defendant also challenges the court's questioning during voir dire because six prospective jurors failed to respond to any of the trial court's panel questions, and none of the prospective jurors responded to the court's question of whether anybody would credit a police officer's testimony over the testimony of other witnesses. Defendant specifically contends the prospective jurors' reluctance to respond could be attributed to "a lack of understanding, resentment, prejudice, anger or embarrassment to reveal unsavory facts before others because the trial court never gave [them] the opportunity to speak privately."

Defendant does not cite any legal authority that would lead us to conclude the trial court abused its discretion as a result.[3] It is defendant's burden to "affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority." (*Bullock v. Philip Morris USA*, *Inc.* (2008) 159 Cal.App.4th 655, 685; see Cal. Rules of Court, rule 8.204(a)(1)(C).) In the absence of any legal authority suggesting the trial court erred under the circumstances, we cannot conclude the trial court's questioning was improper.

In addition, contrary to defendant's assertion, the jury did respond to the court's question of whether any of the potential jurors would have difficulty using the same standards to assess a police officer's testimony as that used to judge other witnesses. The court noted none of the jurors raised a hand in response to the question and interpreted the jurors' abstention to indicate they would not have any difficulty using the same

---

[3]We note defendant's discussion of a 2004 report examining a 1999 article. (Nat. Center for State Cts., Examining Voir Dire in California (Aug. 2004) p. 11; Mize, *On Better Jury Selection: Spotting UFO Jurors Before They Enter the Jury Room* (Spring 1999) 36 Ct. Rev. 10.) However, this is not a primary or even a secondary authority. Although helpful, these materials do not compel a particular result.

standards to assess the testimony of all witnesses, including police officers. Thus, defendant's interpretation of the jurors' silence as a "a lack of understanding" is unpersuasive and is not supported by the record.

We conclude the trial court did not err in questioning the jury during voir dire.

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment to send to all appropriate agencies to reflect the following corrections:

1. Defendant was convicted of violating section 286, subdivision (c)(1) of the Penal Code, pursuant to count 2.

2. The box indicating a sentence is consecutive shall be marked as to counts 1, 4, and 5.

In all other respects, the judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
POOCHIGIAN, Acting P.J.


_____
DETJEN, J.