Filed 9/25/15  P. v. McAdory CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ARTHUR McADORY,<br><br>    Defendant and Appellant. | H040483<br>(Santa Clara County<br>Super. Ct. No. C1090236) |

Defendant Arthur McAdory appeals from a judgment of conviction entered after a jury found him guilty of kidnapping to commit robbery (Pen. Code, § 209, subd. (b)(1) – count 1),[1] seven counts of false imprisonment (§§ 236, 237 – counts 2, 5, 7, 9, 11, 13, & 15), and seven counts of robbery (§§ 211, 212.5, subd. (c) – counts 3, 4, 6, 8, 10, 12, & 14).  The jury also found true the allegations that defendant personally used a firearm (§ 12022.53, subd. (b)) in connection with counts 1, 3, 4, 6, 8, 10, 12, and 14, and that he was armed with a firearm (§ 12022, subd. (a)(1)) in connection with counts 2, 5, 7, 9, 11, 13, and 15.  The trial court sentenced defendant to an indeterminate life term with a determinate consecutive term of 23 years.  On appeal, defendant contends:  (1) there was insufficient evidence to support the personal firearm use findings in connection with counts 3, 6, 8, 10, 12, and 14; (2) the trial court erred in instructing  on the firearm-use

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

enhancement pursuant to CALCRIM No. 3146; and (3) the trial court abused its discretion when it failed to inquire into the possibility of juror disqualification for racial bias. We conclude that the judgment must be reversed and the case must be remanded for the trial court to investigate whether jurors were racially biased.

## I. Statement of Facts
### A. Prosecution Case

On September 18, 2010, Jose Villalobos was working as a security guard at The 408 Compassion Center, a medical marijuana clinic. At around 6:30 p.m., Villalobos was preparing to take out the trash. Edgar Pacheco, who also worked as a security guard, was watching the surveillance camera and told Villalobos that a group of men was approaching. Villalobos said that he would check them out.

When Villalobos went outside, defendant approached him while the three other men entered the clinic. Defendant told Villalobos, "Come on, little nigga. You are coming with me," as he placed a gun against his ribs and directed him towards the clinic. According to Villalobos, defendant's black AP-9 assault pistol was partially outside the front pouch of his sweatshirt. The pistol had a perforated barrel and an extended magazine, which was approximately eight inches long.

After defendant and Villalobos entered the clinic, someone asked Villalobos to lie down and his hands were zip tied. Villalobos recognized one of the perpetrators as Dante Butler. Butler was holding a nine-millimeter handgun. Villalobos heard people screaming and someone asking "who was Lance?" and "who was Hope?" They did not take anything from Villalobos, but they took "everybody's purse and everything." Villalobos heard someone say, "[L]et's shoot them" to which someone else said, "[N]o, no." The last of the robbers to leave the clinic told the victims not to go outside or they would be shot. Shortly thereafter, Villalobos was able to free his hands and the police were called.

2

Pacheco testified that he was using a metal detector wand at the door when the group of men entered the clinic. One of the men put a gun to Pacheco's throat and told him to sit down. The gun touched his skin and it felt like metal. After Pacheco sat down, they zip tied his hands and told him to lie down. He heard a lot of yelling and glass breaking. Pacheco did not try to resist because he "was bringing nothing to the gun fight."

Suzanne Sturek testified that she was being trained to perform various tasks as a volunteer on the day of the robbery at the clinic. At about 6:30 p.m., she saw a group of men walking towards the clinic. Sturek saw defendant holding a gun towards Villalobos's head as they were coming to the door of the clinic.[2] Defendant's gun was "larger than the size of someone's hand." As the men entered, they announced that it was a robbery. There was a locked door between the front room and the dispensary room. The door was remotely controlled. One of the robbers came around behind Sturek, pointed a gun at her head, and said, "[O]pen the door with the buzzer or I'll kill you." The gun was black metal. Sturek complied "because they were all holding guns and [her] life was at risk."

Sturek watched as Hope Delfino tried to hold the door closed as one of the robbers pulled it open. After the robber entered the dispensary room, Sturek heard some of the robbers asking, "Where is the money? How do you get into the safe? What's the code, bitch? How do you unlock it? Where is the manager?" She also heard Delfino screaming. The robbers, who had remained in the front room, told Sturek, Villalobos, Pacheco, and another employee, Anqelique Pippin, to get on the floor. The victims' hands and feet were bound with zip ties. The robbers also told the victims to shut up or

---

[2]     Sturek viewed a surveillance video of the robbery. According to Sturek, the "little snippet" of the video did not show "the whole story of what happened in the front" of the clinic.

they would be shot.  As the robbers left the clinic, one of them said, "If I see any of you coming out this door, I swear to God, I'll come back in and fucking kill you."

Pippin testified that she was working as a receptionist in the front room when three men entered the clinic.  One of the men pushed Pacheco to the wall while another said, "[T]his is a robbery."  She saw that the men had firearms and she put her hands up.  A fourth man entered, shoved her to the floor, and zip tied her hands.  Pippin recognized the fourth man as Dante Butler, because he was her friend's brother.  Butler was wearing a baseball hat and holding a "little black handgun."  All of the robbers had handguns and one of the other three men had "a bigger gun than the rest."  According to Pippin, there were "three handguns and one had like a banana clip.  [¶] . . . [¶]  Like it was pretty big, had a banana clip.  He was holding the banana clip."

Pippin saw one of the robbers push open the door that Delfino was trying to close.  Three of the robbers then went into the dispensary room and Butler stayed in the front room.  Pippin heard someone in the dispensary room say, "[L]et's just kill them all."  When Pippin asked Butler not to take her purse, he placed it under a chair.  Butler left the clinic first and was followed by the other three robbers.  However, one robber returned, told them to keep their heads down and their mouths shut, threw everything off the desk, grabbed her purse, and left.

Delfino testified that she worked at the front desk and managed inventory at the clinic.  While Delfino was in the inventory room, she noticed a group of men on the monitor.  They walked in and "things just didn't seem right.  They were really hostile in the front."  As Delfino opened the door, she was met by a man with a gun.  She tried to shut the door, but he told her that he was going to kill her if she did not let go.  She complied.  After he entered, he turned her around and pushed her to the floor so hard that her teeth cracked.  This robber then hit Lance Jensen over the head with a black gun, which looked real.

4

Defendant entered the dispensary room and told Delfino not to look up. He went through her pockets, took a cell phone and her identification, and told her to be quiet or he was going to kill her. Delfino was so distressed that she urinated. Defendant laughed and said, "Bitch, you peed your pants." After defendant asked where the surveillance camera was, she indicated the next room and she could hear him dismantle it. Defendant returned and hit the back of her head and asked who knew how to open the safe. She pointed to Jensen. He then grabbed Jensen.

Delfino saw two robbers, including defendant, leave the dispensary room with guns in their hands. She testified, "As they were walking out the door, I did look up and see both gentlemen when they walked out. Both had weapons in their hands. I briefly looked up as they were leaving out the dispensary door and that's when I had seen that both of them had weapons in their hands. So at one point, yes, I did see that both of them had weapons."

Victor Chargin testified that he was working in the dispensary room when he saw Delfino struggling to close the door. A man entered, approached Jensen, and "pistol whipp[ed]" him. The man then went to Chargin, waved a "big gun" with a long barrel, and said, "You know what this is, don't you?" He told Chargin to get down, which he did. The man emptied Chargin's pockets and asked him if he had any phones on him. He heard glass breaking as the robbers placed the glass containers of marijuana in a bag. He heard another voice, say, "Did you check this guy?" At that point, one man put a gun to his back and was saying "you better not have anything on you, you don't have a phone or anything on you" while the other was going through his pockets and took the keys to his truck.

Jensen testified that he was working as a manager at the clinic when the robbery occurred. Jensen was in the dispensary room and preparing to close for the day when he heard some noise in the front room. Jensen saw Delfino open the door and "multiple" men enter. A man, who was wearing a bandana and a hat, approached Jensen and told

5

him to get down. This man then hit him with a semiautomatic black pistol and knocked him down. The man grabbed his wallet, which contained $300, his debit cards, and his driver's license, out of his pocket.

The robber put one of his hands on Jensen's neck and shoulder and guided him from the dispensary room to the safe in the inventory room. His was holding a gun in his other hand. The robber wanted him to open the safe, but it was already open. He told Jensen to lie down and tied his hands with an electrical cord. The robber removed marijuana from the safe and asked if there was anything else of value. Jensen said no, and the robber left the room.

Defendant had also entered the dispensary room and placed glass jars of marijuana into large garbage bags. Defendant had a gun in his hand, but Jensen could not describe it. After the robbers left, Jensen freed himself and called 911. The robbers took about $1,500 in cash and $30,000 worth of marijuana. One of the robbers had thrown the video system on the floor.

Jensen viewed the surveillance video of the robbery and identified a frame in which defendant picked up a gun with which the other robber had hit Jensen. Jensen was very sure that it was a "real" gun because the opening of the barrel was larger than the opening of the barrel of a BB gun.

After viewing the surveillance video of the robbery, Detective Brandon Sanchez went to Las Vegas to interview defendant. Defendant was "very talkative and engaging" and initially denied that he had committed a robbery at the clinic. However, when Detective Sanchez showed him the photographs that were taken from the surveillance video, defendant said, "That's me," and stopped talking.

6

## B. Defense Case

Defendant testified in his own behalf.[3]  He testified that he participated in the robbery with three other people, including his cousin, Butler.  When defendant encountered Villalobos in the parking lot, he denied that he had a gun or that he had threatened him.  Defendant was six feet five inches tall and weighed about 300 pounds and Villalobos weighed about 120 to 140 pounds.  Defendant said, "Nigga, follow your people," to Villalobos.  Defendant did not grab him, but followed him inside the clinic.

Defendant's accomplice struggled with Delfino to open the door, pushed her to the ground, and hit Jensen in the face with a gun.  His accomplice then walked toward Chargin, pointed the gun at him, and forced him to the floor.  Defendant denied that he was the one who took Delfino's identification out of her back pocket.

Two of his accomplices had BB guns, which were inoperable.  They used BB guns "to produce fear but not really intent on harm."  According to defendant, the only time that he held a gun during the robbery occurred when he was in the back room.  As defendant was putting jars in a bag when he noticed that his accomplice had set down his gun as he was going through the cash register.  Defendant picked it up, "because [he] was more or less thinking like why would you set it down anyway."  Defendant also explained that he picked the gun up so that the victims would not discover that it was not a "real gun."  Defendant held the gun for two or three minutes while "rummaging through the place."  Defendant testified, "once my accessory came out of that back room, . . . I gave it back to him because I was carrying stuff out the front door."

According to defendant, both guns were broken and inoperable.  Butler had the other gun, which fell apart during the robbery.  After they left the clinic, defendant threw Butler's gun out the window of their vehicle, because it was "more pieces to actually hold."  Defendant placed the other gun in a zip-lock bag and put it in his aunt's garage

---

[3]     Defendant had a prior conviction of conspiracy to commit burglary in 2005.

7

about 30 minutes after the robbery. Defendant's father was present at his aunt's house and defendant told him that they had just robbed the marijuana clinic. Defendant hid the BB gun, because he thought that he might be apprehended for the robbery. As defendant explained to the others, he "wanted to always be able to show that it was just a BB gun." After defendant was arrested, he called his father and told him to give the BB gun to his attorney's investigators.

Defendant initially lied to the detective about his participation in the robbery. However, when the detective confronted him with the photograph from the surveillance video, he knew that he had been caught and admitted that he was the person in the photograph.

Arthur Daniel McAdory, defendant's father, testified that on September 18, 2010, he saw defendant with a gun in the garage and he asked him what he was doing. Defendant told him that it was just a BB gun, "times [were] kind of hard," and he had just committed a robbery. Defendant put the gun in the attic. In May 2011, defendant's father retrieved the BB gun. Defendant had told him that his attorney wanted the gun and so he took it to the attorney's office. Defendant did not provide any details of the robbery to his father. Defendant told his father that "all he did was ran in and grabbed some weed, he wasn't hurting nobody." Defendant's father was convicted of perjury in 1990 and possession of a controlled substance and having a loaded operable firearm in 1998.

## C. Rebuttal

Karla Hankel, a criminalist, testified that the BB gun found in defendant's aunt's residence was operable.

8

## II. Discussion

### A. Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support findings that he personally used a firearm (§ 12022.53, subd. (b)) in the commission of counts 3 (Sanchez), 6 (Sturek), 8 (Pippin), 10 (Chargin), 12 (Jensen), and 14 (Delfino).

Section 12022.53, subdivision (b) provides that "any person who, in the commission of a felony specified in subdivision (a)," which includes the crime of robbery, "personally uses a firearm, shall be punished by an additional and consecutive term of imprisonment in state prison for 10 years."

"Proof of firearm use during a felony does not require a showing the defendant ever fired a weapon. 'Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct *which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.* "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage." [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.] 'Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure.' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806-807.)

"The law we apply in assessing a claim of sufficiency of the evidence is well established: ' " ' " '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " ' [Citation.] The

standard is the same under the state and federal due process clauses.  [Citation.]  'We presume "'in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]  This standard applies whether direct or circumstantial evidence is involved."  [Citation.]'  [Citation.]"  (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 294.)

Here, Sturek, Pippin, and Pacheco were in the front room of the clinic when the robbery occurred.  Sturek saw defendant pointing a large gun towards Villalobos's head as they were coming to the door of the clinic.  Thus, defendant's holding of the gun to Villalobos's head in front of the clinic as his accomplices made threats constituted use of the firearm.  According to Pippin, all of the robbers had handguns and one of them had "a bigger gun than the rest."  She explained that there were "three handguns and one had like a banana clip."  Pippin did not identify which robber had the larger gun.  However, the jury could reasonably infer that it was defendant, because Villalobos described defendant's gun as a black AP-9 assault pistol with an extended magazine of eight inches.  Based on the testimony of Sturek and Pippin, the jury could reasonably find that defendant displayed the handgun in the front room of the clinic in order to carry out the robbery.  Thus, there was substantial evidence to support the firearm use enhancement as to Sturek, Pippin, and Pacheco, who was also in the front room.

Defendant admitted that he held a gun in the dispensary during the robbery when one of his accomplices set it down.  Though defendant claimed that he held the gun so that the victims would not discover that it was not a real gun, the jury could have reasonably rejected this testimony.  The surveillance video of the robbery showed defendant picking up a gun with which his accomplice had hit Jensen.  Jensen was sure the gun was "real" due to the size of the barrel.  Chargin also testified that one of the robbers waved a "big gun" with a long barrel, and said, "You know what this is, don't you?"  Delfino also saw defendant with a gun during the robbery.  Thus, there was

10

substantial evidence that defendant displayed a firearm in the dispensary room to facilitate the robbery of Jensen, Chargin, and Delfino.

### B. CALCRIM No. 3146

The trial court instructed the jury pursuant to CALCRIM No. 3146: "If you find the defendant guilty of the crimes charged in Counts One, Three, Four, Six, Eight, 10, 12 and 14, you must then decide whether for each crime the People have proved the additional allegation that the defendant personally used a firearm during the commission of that crime. [¶] You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] . . . [¶] Someone personally uses a firearm if he or she intentionally does any of the following: [¶] Displays the weapon in a menacing manner, hits someone with the weapon or fires a weapon. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. [¶] If the People have not met this burden, then you must find that the allegation has not been proved."

Defendant contends that CALCRIM No. 3146 was prejudicially deficient for failing to inform the jury of a scienter requirement. He argues that section 12022.53 requires "knowledge and awareness of the attendant circumstances constituting the commission of the underlying crime." We disagree.

As this court stated in *People v. Wardell* (2008) 162 Cal.App.4th 1484: "The definition of personal use of a firearm consists of a description only of the proscribed act—'personal[ ] use[ ] [of] a firearm in the commission of a felony or attempted felony.' [Citation.] No intent to 'do some further act or achieve some additional consequence' is part of the statutory definition. [¶] . . . It is well established that the prosecution must prove that the defendant 'intentionally' used the firearm [citation], and that this use occurred 'in the commission of' the crime. . . . [¶] . . . [¶] . . . A gun use occurs 'in the commission of' an offense if the gun use in fact *objectively facilitated* the commission of

11

the offense. The issue is not one of the gun user's *subjective* mental state but of the *objective role* that the gun played in the commission of the crime." (*Id.* at pp. 1494-1495.) Thus, CALCRIM No. 3146 correctly sets forth the elements of a personal use of a firearm enhancement.

Relying on *People v. Williams* (2001) 26 Cal.4th 779 (*Williams*), defendant argues that a personal use of a firearm finding includes a scienter element. Thus, he claims that "if Susan Sturek in fact saw McAdory holding a gun to Villalobos's head, there still must be evidence that McAdory actually knew of Sturek's existence and of Sturek's ability to see outside from inside The 408 Compassion Center. Similarly, if it could be inferred that McAdory at some point in the transaction of events displayed the gun while all the victims were on the floor, it must still be shown that McAdory [] somehow knew that one or more of those victims looked up to see him holding the gun." (Italics omitted.) Defendant's reliance on *Williams*, *supra*, 26 Cal.4th 779 is misplaced. At issue in *Williams* was the mental state necessary to support an assault conviction. *Williams* observed that "[b]ecause assault criminalizes conduct based on what *might* have happened— and not what *actually* happened—the mental state for assault incorporates the language of probability, i.e., direct, natural and probable consequences. This language, however, arguably implies an objective mental state consistent with a negligence standard. [Citation.]" (*Id.* at p. 787.) *Williams* thus clarified the appropriate mental state: "Based on the 1872 definition of attempt, a defendant is only guilty of assault if he intends to commit an act 'which would be indictable [as a battery], if done, either from its own character or that of its natural and probable consequences.' [Citation.] Logically, a defendant cannot have such an intent unless he actually knows those facts sufficient to establish that his act by its nature will probably and directly result in physical force being applied to another, i.e., a battery. [Citation.] In other words, a defendant guilty of assault must be aware of the facts that would lead a reasonable person to realize that a battery would directly, naturally and probably result from his conduct.

12

He may not be convicted based on facts he did not know but should have known." (*Id.* at pp. 787-788.) Here, CALCRIM No. 3146 instructed the jury to return a true finding on the firearm-use enhancement if it found that defendant intentionally displayed the weapon in a menacing manner during the commission of the robbery. Thus, unlike in *Williams*, the language of CALCRIM No. 3146 does not "impl[y] an objective mental state consistent with a negligence standard." (*Williams*, at p. 787.)

### C.  Voir Dire of Jurors

Defendant also contends that the trial court abused its discretion when it failed to inquire into the possibility of juror disqualification for racial bias.

The constitutional right to a trial by jury includes the right to unbiased and unprejudiced jurors. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1312.) "[B]ias is seldom overt and admitted. More often, it lies hidden and beneath the surface. An individual juror 'may have an interest in concealing his own bias [or] may be unaware of it.' [Citation.] To paraphrase an earlier statement by this court, made in the context of attorney voir dire, '[b]ecause racial, religious or ethnic prejudice or bias is a thief which steals reason and makes unavailing intelligence—and sometimes even good faith efforts to be objective—trial judges [must, where appropriate, be willing to ask] prospective jurors relevant questions which are substantially likely to reveal such juror bias or prejudice, whether consciously or unconsciously held.' [Citation.]" (*Id.* at pp. 1312-1313.)

Whether a hearing on juror disqualification is required depends on whether " ' ' "the court possesses information which, if proven to be true, would constitute 'good cause' to doubt a juror's ability to perform his duties and would justify his removal from the case. [Citation.]" [Citation.]' [Citations.]" (*People v. Fuiava* (2012) 53 Cal.4th 622, 702.)

After the jury had begun its deliberations, it sent a note that Juror No. 1 had requested to be removed. The trial court questioned Juror No. 1 outside the presence of

13

the other jurors. The juror, who was the only African-American on the jury, stated: "During our deliberations, there have been some statements made that reference race and I felt very offended. I can't continue. I don't want to hear that's a part of their culture. I was asked -- they were talking about certain things and I was asked to let them know if I was related to the defendant." She stated that it involved two jurors. Juror No. 1 explained: "Well, in the first comment, we were discussing who would notify or tell their parent that they had committed a robbery. And in the deliberations, juror number two stated, well, that's a part of their culture." Juror No. 1 understood the comment to be a reference to African-American culture. The juror continued: "When I notified them this morning that I chose not to be a part of the panel anymore, he said he didn't intend for it to be a racist statement. He was making reference to where he grew up and that was a part of, you know, their culture, being he was Hispanic and grew up with a lot of Afro Americans. And I personally take that as a racist statement. . . . [¶] . . . [¶] . . . This morning he said including his own when I brought it back up."

As to the second comment, Juror No. 1 stated: "One of the jurors, juror in seat number three, as we were exiting yesterday, they were wondering what would happen to the defendant's notepads and whether or not he was making reference to who we were. And they were saying, well, I don't think he knows our names. [¶] . . . So when they asked me -- the juror down here asked me to make sure I would let them know if I was related to the defendant. And when I told them this morning that I was very insulted by that because no one else was asked if they were related to the defendant. I'm the only Afro American juror in there." She also indicated that she would be unable to deliberate in the case.

After the juror left the courtroom, the trial court stated: "Well, it's obvious to me that juror number one does not feel that she would be able to continue to serve as a juror in this case. We do have two substitute jurors. [¶] Based on what I have heard, it does not appear to me that this jury is basing its deliberations on race. The concern with

14

regard to security happens in every -- I hear that from jurors in every single case where there is an allegation of armed conflict or assault. Jurors are always worried about what's going to happen with their personal information and their notes. [¶] The comment that she has described to the Court from juror in seat number two, No. 34 on the list, you know, appears to -- although I can see how it might have been taken as a racist comment -- it doesn't appear to the Court to have been intended as a racist comment. She is talking about some people in their culture would tell their parents everything, that others might not. I'm not hearing this directed at African Americans specifically, just a recollection that in different cultures, there's a different openness. At least that's the way I infer." Defense counsel indicated that he wanted the trial court to investigate further and stated that "[f]rom her comments, it's hard to tell of course exactly what's going on."

Regarding the reference to culture, the following exchange occurred: "[DEFENSE COUNSEL]: The culture. Yeah. I mean, clearly -- I shouldn't say clearly -- to me that indicates at the very least a racial prejudice and a racial element being brought into the deliberations. And I don't think that's appropriate. I'm not sure -- [¶] THE COURT: In what respect does it represent a racial element reflecting on the fact that juror number one understood that he was explaining that he was referring to various cultures, including his own Hispanic culture: [¶] [DEFENSE COUNSEL]: That was his explanation today after the fact, after apparently -- I'm inferring -- felt apologetic or realized that he had said something to offend her and he had an explanation, I was referring to all culture or my culture. When she first described the comment, I believe she described it as clearly racial or racist. And I don't think it's appropriate. I'm not sure what I'm asking the Court to do, but I would at least like to investigate it or have the Court investigate it. [¶] I don't know the procedures that can be utilized, if any. I don't -- well, I'll leave this there. But I'm very concerned about the comments, judge, and all three of those comments I think concern me as there appears to be some racism has come into the deliberation process, and that's with juror number one present. [¶] So I'm

15

concerned about it. [¶] [THE PROSECUTOR]: I agree with the Court's interpretation on that. I understand certainly how juror number one could have taken offense to that. I think that juror in seat number two -- again, we are all reading the tea leaves for lack of a better word -- we are not sure of what the exact context or the deliberation is. I'm in no way excusing that comment, but I'm just saying I think when he asked her to clarify, she said he told her he was referring to his own culture and where he grew up as well, and I don't think that equates to a discussion based on race or animus towards one race."

The trial court noted that Juror No. 1 was "literally bristling" and was unable to continue deliberating. When the trial court indicated that it would excuse Juror No. 1, neither party objected.

Following a recess, the trial court again questioned Juror No. 1 regarding whether she was unable to continue to deliberate. After the juror indicated that she was unable to do so, the trial court excused her. The trial court decided not to conduct further inquiry as to racial bias by other jurors. The trial court stated: "There are two issues that seem quite obvious to me. The first is that juror in seat number one for whatever reason simply did not accept the explanation of juror in seat number two, No. 34 on the list, who the record should reflect is a very dark-skinned Hispanic gentleman, that he was making a reference, and even as he cited it, to his own culture. And because the statement was made in response to what appeared to be a general discussion of is it reasonable to think somebody would tell their dad they had just committed a robbery, I simply do see nothing in this that suggests that racism is somehow a basis for the jurors being prejudiced in such a way that it's influencing their decision making as with respect to the defendant. There is just nothing there in that to suggest that. [¶] With respect to the comment from a person she's unable to identify – and I would point out that there is no one sitting in seat four or five who is a Caucasian man in his 50s with glasses. [¶] In fact, there is only one person in the front row who is a Caucasian man and he is, one has to assume, at the very least in his 60s and much more likely in his 70s. He is considerably older than anyone

16

else on this jury panel and identifiable by that fact. The only other Caucasian person who has glasses is totally bald and sitting in the back row and appears to be substantially younger than in his 50s. [¶] So I just can't even begin to understand who she might be referring to. [¶] . . . [¶] [DEFENSE COUNSEL]: Judge, if I may. Juror in seat number 12, this morning I noticed had a pair of glasses in his pocket and he took them out and put them back. So he may wear them sometimes and not others. I don't know. [¶] THE COURT: All right. [¶] And he also appears to the Court in any event to be substantially younger than 50, of course maybe everyone is looking young to me these days. But the bottom line is it seems quite apparent to this Court that this was a very unfortunate and misplaced attempt at humor based very much on the way that juror number one described it, and her offense is something that this Court has no way to deal with other than to grant her request based on her indication that she is unable to continue deliberating. [¶] But there is nothing in either of those comments that suggests to this Court that the jury is improperly deciding this case. And I'm not going to inquire into the conduct of their deliberations further. [¶] However, in an abundance of caution, and as a reminder, and particularly because we are now inserting our alternate juror number one into the jury, and I'm going to have to instruct them in any event on starting their deliberations from the beginning, it would be my intention to read from CALCJIC 0.50, beginning only with the portion, you must accept and follow the law as I state it to you, and then must not be influenced by pity, prejudice, sympathy, public opinion and so forth. So just those two paragraphs I'm going to read back to the jury as a whole. [¶] That agreeable to both sides? [¶] [THE PROSECUTOR]: Yes, Your Honor. [¶] [DEFENSE COUNSEL]: Yes, Your Honor. [¶] THE COURT: All right. And I think that will hopefully resolve any issue that might exist, although quite frankly I don't genuinely believe there is one."

The Attorney General contends that defendant has forfeited the claim that the trial court abused its discretion in failing to inquire about racial bias. She cites to the portion of the record in which defense counsel agreed with the trial court's ruling. We disagree

17

with this characterization of the record. Defense counsel expressly requested that the trial court inquire as to whether the statements were racially motivated. After the trial court decided that Juror No. 1 would be dismissed and that it would not inquire further, it stated that it would instruct the jurors pursuant to CALJIC No. 0.50 and asked if this was "agreeable to both sides." It was at this point that defense counsel indicated his agreement with the trial court. Accordingly, defendant has not forfeited his contention.

The present case involved a cross-racial crime. Defendant and three other African-American men robbed Hispanic and white victims. The central issue at trial was whether defendant or the victims were more credible regarding whether defendant used force to effect Villalobos's movement into the clinic and whether defendant and the others were using BB guns, which were not subject to enhancement, or firearms. During deliberations, a Hispanic juror opined that it was "a part of their culture" for African-Americans to tell their parents that they had committed a robbery. One could reasonably infer from this comment that the juror believed African-Americans discussed criminal behavior with family members because it was part of their culture to commit crimes. As to this comment, both the trial court and the prosecutor acknowledged that they could understand how Juror No. 1 could have understood it as racist. Defense counsel noted that it was only after the juror was challenged about his statement that the juror stated that he did not "intend for it to be a racist statement" and that the statement referenced his own culture as well. Defense counsel indicated that "it's hard to tell of course exactly what's going on" while the prosecutor acknowledged, "[W]e are all reading the tea leaves for lack of a better word." The trial court commented that Juror No. 1 did not find the juror's explanation credible. Nevertheless, the trial court found the juror's explanation credible without ever questioning him. As to the second comment regarding Juror No. 1's possible relationship to defendant, the trial court concluded "this was a very unfortunate and misplaced attempt at humor." Juror No. 1 never indicated that this juror had explained his comment and she did not find the comment humorous,

18

and thus it is unclear how the trial court reached this conclusion.  In our view, both jurors' comments indicated possible bias.  Based on this record, the trial court abused its discretion in failing to question the two jurors to determine whether they or any of the other jurors were biased.  Accordingly, the case must be remanded for the trial court to conduct an adequate inquiry into juror disqualification.

## III.  Disposition

The judgment is reversed.  The cause is remanded to the trial court with directions to hold a hearing to inquire into juror disqualification for possible bias of the two jurors identified by Juror No. 1.  If it appears during that hearing that other jurors might have also been involved in conversations indicating bias, the trial court will hold a hearing to inquire into juror disqualification for possible bias by these jurors.  If the trial court finds that there are no grounds for juror disqualification, the judgment shall be reinstated as of that date.  If the trial court determines that it is not feasible to hold a hearing due to unavailability of these jurors or finds that there are grounds for juror disqualification, the prosecutor shall be afforded the opportunity to retry the case.

_____

Mihara, J.

WE CONCUR:

_____
Bamattre-Manoukian, Acting P. J.

_____
Márquez, J.

*People v. McAdory*
H040483

20