Filed 6/20/16  P. v. Smith CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041538 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F21348) |
| v. | |
| RANDY JAY SMITH, | |
| Defendant and Appellant. | |

Defendant Randy Jay Smith appeals his conviction in this child molestation case, for which Smith received an aggregate sentence of 180 years to life in prison.  Smith argues that his conviction must be reversed because the trial court failed to conduct an appropriate inquiry into juror alleged bias, thereby depriving Smith of his constitutional right to a fair trial by 12 unbiased jurors.

For the reasons set forth below, we conclude the trial court did not abuse its discretion based on the facts presented.  We will affirm the judgment.

## I.      BACKGROUND

We limit our background discussion to the factual and procedural information that pertains to the issue on appeal, which is whether the trial court abused its discretion in its inquiry into the alleged bias of Juror No. 9.  The facts underlying the offenses and the evidence adduced at trial are for the most part not relevant, though we briefly summarize the allegations, primary testifying witnesses, and the jury verdict.

## A. Factual and Procedural History

The Santa Cruz County District Attorney filed a consolidated information on August 25, 2014, alleging 14 counts involving five victims over a span of 15 years. Smith was charged with one count of oral copulation with a child 10 years of age or younger (Pen. Code, § 288.7, subd. (b); count 1),[1] eight counts of forcible lewd conduct on a child (§ 288, subd. (b)(1); counts 2-6 & 11-13), four counts of lewd conduct on a child (§ 288, subd. (a); counts 7-10), and aggravated sexual assault of a child (§ 269, subd. (a); count 14). The information also alleged a multiple victim special circumstance (§ 667.61, subd. (b)). The prosecution witnesses included the five charged victims, two of whom were minors at the time of trial, as well as family members of the victims, and Katrina Rogers, the district attorney's investigator in the case, as well as another officer. Inspector Rogers testified briefly only to establish Smith's age through his DMV records.

The jury found Smith guilty as charged and found the multiple victim special circumstance to be true. Smith was sentenced to an aggregate term of 180 years to life in prison, consisting of consecutive 15-year terms on all 14 counts. The terms for counts 2 and 13 were stayed pursuant to section 654. Smith was awarded credit for time served and was ordered to pay $980 in court fees, a $10,000 restitution fine (§ 1202.4), a stayed $10,000 fine (§ 1202.45), and $6,690.34 to the Victim Compensation Board while a further $7,000 in victim restitution remained under the court's consideration.

## B. Juror No. 9 Voir Dire

Juror No. 9 was called to the jury box on the second day of jury selection. The trial court asked Juror No. 9's group if the prospective jurors recognized the names of any of the witnesses or attorneys. Katrina Rogers was listed among the names published to the jury. The jurors at that time, including Juror No. 9, did not answer affirmatively.

---

[1] Further unspecified statutory references are to the Penal Code.

2

In response to a question about connections to law enforcement, Juror No. 9 disclosed, "I have close contact with law enforcement personnel all the time in my job. Professional level. Don't socialize." Juror No. 9 had been employed for 25 years as an emergency equipment technician at a local hospital. The trial court followed up, "And can you treat all witnesses the same? If you have law enforcement officers treating them, judging their credibility by the same standard?" Juror No. 9 replied, "Have to." Juror No. 9 also stated in reply to general voir dire that she could "[k]eep an open mind and hear both sides of the story."

During questioning by defense counsel, Juror No. 9 stated that the defense and prosecution were starting on equal footing and she could be "[o]pen and honest and wait for the evidence to be produced and weigh things at that point." Juror No. 9 opined that she would not switch her vote just to be with the majority because that "would undermine my integrity." She stated that she could "[d]efinitely" deliberate. She acknowledged that memory is subject to change. And she said she would hold the prosecution to its burden of proof and would have no problem not convicting if the government failed to meet its burden.

### C. Juror No. 9 Alleged Juror Bias

The prosecutor disclosed to the trial court on the opening day of trial that Inspector Rogers recognized Juror No. 9 from interviews conducted in an unrelated murder case, which had been tried earlier that year. Inspector Rogers believed she had contact with Juror No. 9 because she remembered her face. Juror No. 9 had been interviewed "multiple times" by another investigator working with Inspector Rogers on that case. She was listed as a witness but was not called at trial. The prosecutor informed the court that he would try to find out more information about Juror No. 9's involvement and would report to the court and defense counsel. The court directed the prosecutor to follow up and report if there were "any issues," noting that although Inspector Rogers was listed as a witness, it was possible that Juror No. 9 had not met her, the "contact was vague," or

3

she did not remember the name. The court also asked defense counsel to bring any issue to its attention, telling both sides: "If and when you want me to take any action, let me know on that issue."

Defense counsel asked the trial court to revisit the subject of Juror No. 9 on the third day of trial. Defense counsel reported her understanding that Juror No. 9 was interviewed in the murder case "multiple times by Katrina Rogers. And she's been—she was—just right now I was outside waiting for the doors to get unlocked. When I walked up, she was sitting down next to a police officer in the hallway, chatting like they were old buddies." Defense counsel suggested that Juror No. 9 had not disclosed her contact with law enforcement because counsel would "have questioned her about that, if she had. And the fact that she was possibly a witness, a prosecution witness in a case very recently. So I just think there was some things that she may not have disclosed to us. . . . [I]f the Defense would have known we would not—we would not have accepted her as a juror."

Defense counsel was also concerned that Juror No. 9 was not focused on the witnesses and instead was "staring directly at the defense table with daggers, so to speak, in her eyes." Defense counsel stated that "a variety of sources in the courtroom" including "court staff" had noticed Juror No. 9 for this reason.

The prosecutor responded that the district attorney's office had continued to search for information but had not found anything further. He confirmed that Inspector Rogers had no reports of personal interactions with Juror No. 9 but was "adamant" that there was some personal contact because she recognized her face. The prosecutor said it was possible that Inspector Rogers may have been involved in some part of interviewing Juror No. 9, then directed the other investigator to do the follow-up interviews.

The trial court stated that it saw no reason to act and asked defense counsel what it wanted the court to do. Defense counsel asked the court to excuse Juror No. 9. The court denied the request: "There's no basis for that. She hasn't done anything inappropriate."

4

The court explained that it had been watching Juror No. 9 since the issue was brought to the court's attention and "I'm not seeing any expressions of hostility." The court had observed Juror No. 9 looking "sometimes" at the witnesses or in the room as opposed to looking directly at Smith. The court reasoned: "So there may have been some contact with Ms. Rogers. The people are still trying to follow-up on that. She was asked if she knew any of the people on the list. Whether or not she would have known Ms. Rogers by name or remember the name—the homicide occurred several years ago. . . . There's no reason to believe . . . the juror lied about anything at this point. But I do want to speak to Ms. Rogers . . . and find out what she remembers of (Juror No. 9)."

The trial court questioned Inspector Rogers about her "recollection of having some interaction with" Juror No. 9. Inspector Rogers explained that she had been the lead investigator on the murder case. Her recollection was "that I was doing a neighborhood canvass for witnesses, and I ha[d] a very small interaction with [Juror No. 9] at her apartment door." Inspector Rogers assigned another investigator to do the follow-up, which resulted in three audio recorded interviews with Juror No. 9. Inspector Rogers confirmed that Juror No. 9 was never called as a witness during the trial.

Defense counsel declined the trial court's invitation to ask any questions of Inspector Rogers. The court concluded: "The Court at this point will take no additional action. Keep me appri[s]ed of any other issue you may have with that individual." Defense counsel did not raise the subject of Juror No. 9 during the remainder of the trial.

## II.    DISCUSSION

Implicit in the constitutional right to a trial by jury is the ability of the jurors to remain unprejudiced and unbiased. (*People v. Taylor* (1992) 5 Cal.App.4th 1299, 1312.) Upon a showing of good cause that a juror is unable to perform his or her duty, the trial court may discharge the juror at any time, including during deliberations. (§ 1089; *People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*).)  "When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a

hearing is *required*." (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 (*Barnwell*); *Lomax*, *supra*, at p. 588.) "If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review." (*Lomax*, *supra*, at p. 588.) Similarly, the manner in which the trial court conducts an inquiry into juror alleged disqualification is subject to review for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 702 (*Fuiava*).) Ultimately, a juror's disqualification for bias, that is, the juror's inability to perform his or her duties as a juror, must appear on the record to a "demonstrable reality." (*Barnwell*, *supra*, at p. 1052; *Fuiava*, *supra*, at pp. 702, 711.)

Smith contends the trial court abused its discretion when it failed to investigate the evidence raising a strong inference that Juror No. 9 was biased in favor of law enforcement and the prosecution. Smith argues that the prosecution's revelations about Juror No. 9, her reported conduct during trial, and her failure to disclose personal contact with the district attorney's office as a witness in a murder case, together constituted "sufficient evidence of possible disabling bias" that required further investigation. To resolve the inference of bias, Smith argues the trial court only needed to briefly interview Juror No. 9 outside the presence of the other jurors.

As a preliminary matter, the People assert that Smith forfeited his claim by failing to ask for an additional inquiry at the time of trial. We do not find the issue forfeited on appeal. "The duty to conduct an investigation when the court possesses information that might constitute good cause to remove a juror rests with the trial court whether or not the defense requests an inquiry, and indeed exists even if the defendant objects to such an inquiry." (*People v. Cowan* (2010) 50 Cal.4th 401, 506 (*Cowan*).) As the court explained in *Cowan*, the trial court's duty is to conduct " 'an inquiry sufficient to determine the facts . . . *whenever* the court is put on notice that good cause to discharge a juror may exist.' " (*Ibid.*, quoting *People v. Burgener* (1986) 41 Cal.3d 505, 519, disapproved on another ground by *People v. Reyes* (1998) 19 Cal.4th 743, 755-756.)

6

Thus, the failure to investigate possible juror intoxication during deliberations was error in *People v. Burgener*, *supra*, 41 Cal.3d at pages 520 through 521, even though defense counsel had declined the trial court's suggestion to speak to the accused juror or to substitute an alternate. (*Id.* at p. 517.) Similarly in *People v. Ray* (1996) 13 Cal.4th 313, 343, the court reviewed on the merits whether the trial court erred in failing to investigate a juror's association with the victim's daughter, even though defense counsel had told the trial court it saw "no 'reason to inquire.' " In *Cowan*, the court considered if the trial court should have inquired into a juror's statement that another juror may have been speaking with the defendant's family members during the penalty phase of a murder trial (*Cowan*, *supra*, 50 Cal.4th at p. 507) and expressly rejected the argument that the defendant had forfeited his juror alleged bias claim. (*Id.* at pp. 505-506.)

In our case, Smith's counsel not only told the court she was concerned that Juror No. 9 had failed to disclose a close connection with law enforcement and appeared to display a negative demeanor toward the accused during the trial, but counsel requested Juror No. 9's dismissal. This was sufficient to preserve the claim that the trial court should have conducted a further inquiry by speaking directly with Juror No. 9, even if Smith's counsel did not make that specific request. Moreover, the trial court had an independent duty to conduct a sufficient investigation regardless of Smith's counsel's position on the information concerning Juror No. 9's potential bias. (*Cowan*, *supra*, 50 Cal.4th at p. 506.) We turn to the question of whether the information possessed by the trial court required further inquiry into Juror No. 9's ability to serve.

The California Supreme Court has summarized the inquiry required upon a showing of good cause under section 1089: " '[W]hen a court is put "on notice that improper or external influences were being brought to bear on a juror . . . 'it is the court's duty to make whatever inquiry is reasonably necessary to determine if the juror should be discharged and whether the impartiality of the other jurors has been affected.' " ' " (*Fuiava*, *supra*, 53 Cal.4th at p. 702.) But " 'not every incident involving a juror's

7

conduct requires or warrants further investigation.' " (*Ibid*.) Like the ultimate decision to retain or discharge a juror, whether and to what extent to investigate juror alleged bias or misconduct is a discretionary determination by the trial court. (*Ibid*.; *People v. Martinez* (2010) 47 Cal.4th 911, 942-943 (*Martinez*).)

The starting point of the reviewing court's inquiry is not whether "there is uncertainty in the record concerning what occurred because the trial court did not conduct an inquiry," but "whether the information the trial court was aware of when it made its decision warranted further inquiry." (*Fuiava*, *supra*, 53 Cal.4th at p. 703.) " ' " 'The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial.' " ' " (*Id*. at p. 702, quoting *People v. Bradford* (1997) 15 Cal.4th 1229, 1348.)

We apply these principles to the facts before the trial court concerning Juror No. 9. When questioned during jury selection about her connections to law enforcement, Juror No. 9 stated that she had extensive contact professionally. Neither counsel nor the trial court asked Juror No. 9 whether she had ever been a witness or involved in a criminal prosecution. Smith contends that Juror No. 9 revealed potential bias by failing to disclose her witness role, because being interviewed by investigators in relation to a murder case is a connection to law enforcement. Taken together with Juror No. 9's reportedly animated chat with a police officer in the hallway and hostile expression toward the defendant, Smith urges the trial court was required to at least ask Juror No. 9 about the facts underlying the inference of bias.

Several factors lead us to conclude that although it might have been prudent for the trial court to briefly question Juror No. 9 about her contact with investigators in the murder case and her ability to remain impartial, the trial court's determination not to do so did not amount to an abuse of discretion. Juror No. 9 responded to several questions during voir dire that were directed at possible bias in favor of law enforcement. Her responses indicated that she "had to" treat all witnesses, including law enforcement, by

8

the same standards, that the defense and the prosecution started on equal footing, and that she would weigh the evidence and hold the prosecution to its burden of proof. Because Juror No. 9 was never asked whether she had been a witness or potential witness in a case, we find no evidence of concealment. To the extent that Juror No. 9 may have inadvertently failed to disclose her connection to an unrelated criminal case, " ' "[t]he proper test to be applied to unintentional 'concealment' is whether the juror is sufficiently biased to constitute good cause" ' " for discharge under section 1089. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 644; *People v. Wilson* (2008) 44 Cal.4th 758, 823.)

We observe nothing in the record to conclude that Juror No. 9 harbored bias sufficient to constitute good cause under section 1089. Juror No. 9's responses to the voir dire questions were unequivocal and did not suggest an underlying bias. When the trial court examined Inspector Rogers about Juror No. 9, Inspector Rogers recalled a fleeting face-to-face encounter with Juror No. 9, who was then referred to talk to another investigator. Inspector Rogers found three recorded interviews by that investigator with Juror No. 9, and the prosecutor told the trial court that he was forwarding those reports to defense counsel. Smith's counsel declined the trial court's invitation to question Inspector Rogers and did not raise the issue with the trial court again, suggesting the reports from the interviews with Juror No. 9 did not trigger additional concerns.

Nor does it appear from the record that Juror No. 9's reported demeanor during witness testimony and friendly conversation with a police officer in the hallway—even viewed alongside her role as an interviewed witness in the murder case—mandated further investigation. The observation that Juror No. 9 was chatting with a police officer "like they were old buddies" did not suggest—and the record does not otherwise reveal—if the police officer with whom Juror No. 9 was engaged was a witness. While a juror's unauthorized contact with a witness is improper, such contact may be nonprejudicial if it was " 'de minimis' " or was unrelated to the trial. (*Cowan*, *supra*, 50 Cal.4th at p. 507.) There is no showing here that the hallway conversation was related to the trial or was

9

more than de minimus chatter, especially in light of Juror No. 9's plain statement during voir dire that she had "close contact with law enforcement personnel all the time" through her work.

Smith's counsel asserted that Juror No. 9 had "daggers . . . in her eyes" when looking toward the defendant. However, the trial court noted nothing inappropriate in Juror No. 9's expression, even though the court had been watching her.[2] We defer to the trial court's observations of Juror No. 9's demeanor because the court had the opportunity to observe the juror for several days. (See *Lomax*, *supra*, 49 Cal.4th at p. 567 [trial judge is best situated to observe prospective juror's demeanor and evaluate competence]; *Barnwell*, *supra*, 41 Cal.4th at p. 1053 [reviewing court defers to the trial court's factual determinations, based on firsthand observations, in investigating juror bias or misconduct].)

We find the sum of "information the trial court was aware of when it made its decision" did not require further inquiry, given the trial court's examination of Inspector Rogers and clear directive to counsel to inform the court of further concerns. (*Fuiava*, *supra*, 53 Cal.4th at p. 703.) The trial court's response was comparable to that of the trial court in *Fuiava*, a death penalty appeal in which the California Supreme Court found no abuse of discretion by the trial court "taking a 'wait and see' approach" to assess if jurors had seen or been affected by spectator conduct during the guilt phase of the trial. (*Id*. at p. 702.) The trial court in *Fuiava* discharged a juror after she reported severe stress due to her observation of two spectators in the courtroom, who the juror believed were supporting the defense and were speaking and pointing at several of the jurors. (*Id*. at

---

[2] Smith asserts in his appellate brief that the inference of bias was sufficient to cause the trial court to "keep an eye" on Juror No. 9. This fact is unremarkable given that the prosecution had brought the issue of Juror No. 9's prior contact with Inspector Rogers to the court's attention only two days before, and the court had asked the parties to keep it apprised of any concerns or new information.

p. 701.)  The juror also reported that several of the jurors had talked about the spectators. (*Ibid.*)  On appeal, the defense argued that after discharging the impacted juror, the trial court should have investigated whether other jurors might have been prejudiced by the spectators' alleged conduct.  (*Id.* at p. 702.)  The high court disagreed, noting that the facts before the trial court at the time did not indicate the other jurors had been affected. (*Id.* at pp. 702-703.)  It was these facts—not the uncertainty in the record resulting from the lack of an inquiry—against which the trial court's decision had to be evaluated.  (*Id.* at p. 703.)

Similarly in *Martinez*, the California Supreme Court concluded the trial court did not abuse its discretion when it refused the defendant's request to conduct a further inquiry into the ability and fitness of a juror to serve, even though the juror was employed at juvenile hall, had admitted general knowledge of the defendant's juvenile delinquency record, and had brief contact with the prosecution's investigator who had called juvenile hall looking for the defendant's disciplinary reports before the start of trial.  (*Martinez*, *supra*, 47 Cal.4th at pp. 942-943.)  In that juror's conversation with the investigator (which occurred during the interval between the juror's swearing-in and the start of trial), the juror made a joking remark to the investigator about getting off the jury.  (*Id.* at p. 940.)  On appeal, the defendant argued that a hearing to evaluate the juror's ability to remain impartial was required under the circumstances.  (*Id.* at p. 942.)  The Supreme Court explained, however, that the inadvertent contact between the juror and the investigator did not give the juror additional information about the case or, by itself, constitute "good cause" casting doubt on her ability to serve, and the other issues concerning the juror's ability to remain impartial had already been addressed during voir dire.  (*Id.* at pp. 942-943.)  Citing the "demonstrable reality" standard, the court further explained that the defendant's claim that the trial court was " 'duty bound' " to conduct an inquiry "lack[ed] merit," because the defendant "fail[ed] to present evidence of actual bias on the part of the juror."  (*Id.* at p. 943.)

11

Here, the trial court's inquiry and brief examination of Inspector Rogers proved " 'sufficient to determine the facts' " that gave rise to the bias allegation (*Cowan*, *supra*, 50 Cal.4th at p. 506), satisfying the requirement that the trial court " ' " 'make whatever inquiry is reasonably necessary to determine if the juror should be discharged . . . .' " ' " (*Fuiava*, *supra*, 53 Cal.4th at p. 702.)  Smith points to *People v. Collins* (1976) 17 Cal.3d 687 as an example of an appropriately extensive inquiry into a juror's ability to serve. But that case is distinguishable on the facts, as the juror had informed the trial court after deliberations began that she "could not decide the case on the evidence and the law since she was involved emotionally more than intellectually." (*Id.* at p. 696.)  The facts in this record more closely resemble those in *Fuiava* and *Martinez*, and do not suggest bias on the part of Juror No. 9 sufficient to form good cause to doubt her ability to perform her juror duties.  The law does not require the trial court to "conduct an inquiry whenever it becomes aware of any indication of a possibility that there might be good cause to remove a juror." (*Fuiava*, *supra*, at p. 703.)

Having concluded that the trial court did not abuse its discretion by ending its inquiry into Juror No. 9 short of questioning the juror, Smith's contention that the trial court's decision constituted reversible error also fails.  Recent California Supreme Court decisions stress that juror disqualifying bias must appear on the record as a "demonstrable reality." (*Barnwell*, *supra*, 41 Cal.4th at p. 1052.)  " ' "Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a 'demonstrable reality.' The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence." ' " (*Martinez*, *supra*, 47 Cal.4th at p. 943; see also *Fuiava*, *supra*, 53 Cal.4th at pp. 703, 711.)  Because the evidence in the record did not amount to an inference of bias sufficient to require further inquiry by the trial court, Smith cannot establish disqualifying bias to a "demonstrable reality."

12

## III.    DISPOSITION

The judgment is affirmed.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Grover, J.